# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————————

### No. 18-1358

———————————————

### UNITED STATES,
Appellee

v.

### JUAN BRAVO FERNANDEZ,
**Appellant**

———————————————

**On Appeal from a Judgment Entered in the United States District Court for the District of Puerto Rico**

———————————————

## BRIEF OF APPELLANT JUAN BRAVO FERNANDEZ

———————————————

**Kimberly Homan**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-8616 (Telephone)**
**(617) 338-9538 (Fax)**
**homanlaw@aol.com**

**Martin G. Weinberg**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**(617) 338-9538 (Fax)**
**owlmgw@att.net**

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

    Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

    Trial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    Senate Project 410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    Senate Project 471 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

    The Las Vegas Trip . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

I.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT
    BRAVO'S CONVICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

    B.    The Evidence Failed to Prove That an Entity of the
          Puerto Rico Government Received More than $10,000
          in Federal Program Benefits, Essential Elements of the
          18 U.S.C. §666 Offense . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

          1.    The stipulation did not satisfy the government's
                burden of proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

          2.    This Court did not decide this issue in *Fernandez* . . .   25

3.      At minimum, the erroneous instruction requires
        a new trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      27

C.      No Reasonable Jury Could Conclude Beyond a
        Reasonable Doubt that the Las Vegas Trip Was a
        Quid Pro Quo Corruptly Given in Exchange for an
        Official Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      30

D.      The Government's Proof of Other Elements of §666
        Was Deficient as Well, Both Factually and as a
        Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      37

II.     THE COURT'S INSTRUCTIONS TO THE JURY DENIED
        DEFENDANTS A FAIR TRIAL . . . . . . .. . . . . . . . . . . . . . .      38

A.      An Overview of the Court's Instructions . . . . . . . . . . . . .      38

B.      Failure to Fully Inform The Jury Regarding
        What Is Not a Bribe Under §666 . . . . . . . . . . . . . . . . . . .      41

        1.      The requested instruction was correct as a matter
                of substantive law . . . . . . . . . . . . . . . . . . . . . . . . .      42

        2.      The requested instruction was not substantially
                incorporated in the charge . . . . . . . . . . . . . . . . . . . .      42

        3.      The requested instruction was integral to an
                important point in the case . . . . . . . . . . . . . . . . . . . .      46

C.      Failure to Instruct the Jury that It Was Required to
        Find that Martinez and de Castro Font Changed Their
        Positions on 410 and/or 471 . . . . . . . . . . . . . . . . . . . . .      47

D.      Erroneous Instructions That the Jury Was Not to
        Consider the Merits of Senate Projects 410 and 471
        for Any Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      53

ii

III.   THE COURT ERRED IN EXCLUDING IMPORTANT
       DEFENSE TESTIMONY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

IV.    THE DISTRICT COURT ERRED IN CALCULATING
       BRAVO'S GUIDELINES OFFENSE LEVEL . . . . . . . . . . . . . . .   60

       A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   61

       B.    Medina's Testimony Was Not a Reliable Basis for the
             Imposition of a 14-level Adjustment . . . . . . . . . . . . . . . . .   64

       C.    The Court's Conclusion That Loomis Would Have
             Immediately Gone out of Business upon the Passage
             of 471 Was Speculative and Unfounded . . . . . . . . . . . . . . .   69

       D.    There Is No Basis for a Finding That Bravo Reasonably
             Expected That Ranger Would Obtain All of Loomis' 2005
             Armored Car Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   73

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . .   74

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   75

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Arcam Pharm. Corp. v. Faria*, 513 F.3d 1 (1st Cir. 2007) . . . . . . . . . .    26

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) . . . . . . . . .    20

*Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72 (1st Cir. 2010) . . . . . . .    58

*Bond v. United States*, 134 S. Ct. 2077, 2083 (2014) . . . . . . . . . . . . . .    20

*Bravo-Fernandez v. United States*, 137 S. Ct. 352 (2016) . . . . . . . . . . .    3

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . .    27

*Brotherhood. of R. R. Trainmen v. Baltimore & O. R. Co.*,
    331 U.S. 519 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

*Carter v. United States*, 530 U.S. 255 (2000) . . . . . . . . . . . . . . . . . . . . .    29

*Chapman v. California*, 386 U.S. 18 (1967) . . . . . . . . . . . . . . . . . . . . . .    30

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
    972 F.2d 453 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

*Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co.*,
    40 F.3d 492 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

*Fischer v. United States*, 529 U.S. 667 (2000) . . . . . . . . . . . . . . . . . . .19, 21, 23, 24

*Jones v. United States*, 529 U.S. 848, 858 (2000) . . . . . . . . . . . . . . . . .    20

*Marinello v. United States*, 138 S.Ct. 1101 (2018) . . . . . . . . . . . . . . . .    20

*Massachusetts Ass'n of Health Maint. Organizations v. Ruthardt*,
    194 F.3d 176 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    29

*McCormick v. United States*, 500 U.S. 257 (1991) . . . . . . . . . . . . . . . .     51

*McDonnell v. United States*, 136 S. Ct. 2355 (2016) . . . . . . . . . . . . . .     20, 51

*Municipality of San Juan v. Rullán*, 318 F.3d 26 (1st Cir.2003) . . . . . .     26

*Neder v. United States*, 527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . .     30

*Netsphere, Inc. v. Baron*, 799 F.3d 327 (5th Cir. 2015) . . . . . . . . . . . .     26

*Sabri v. United States*, 541 U.S. 600 (2004) . . . . . . . . . . . . . . . . . . . . . .     20

*Telecommunications Regulatory Bd. v. CTIA-Wireless Ass'n*,
    752 F.3d 60, 65 (1st Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . .     29

*United States v. Adams*, 740 F.3d 40 (1st Cir. 2014) . . . . . . . . . . . . . .     42

*United States v. Alfisi*, 308 F.3d 144 (2d Cir. 2002) . . . . . . . . . . . . . . .     38

*United States v. Alli*, 444 F.3d 34 (1st Cir. 2006) . . . . . . . . . . . . . . . . .     72

*United States v. Appolon*, 695 F.3d 44 (1st Cir. 2012) . . . . . . . . . . . . .     69

*United States v. Ayala-Pizarro*, 407 F.3d 25 (1st Cir. 2005) . . . . . . . . .     59

*United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) . . . . . . . . . . . . . . .     22, 44

*United States v. Birge*, 830 F.3d 1229 (11th Cir. 2016) . . . . . . . . . . . . .     26

*United States v. Bravo-Fernandez*, 790 F.3d 41 (1st Cir. 2015) . . . . . .     3

*United States v. Candelaria-Silva*, 162 F.3d 698 (1st Cir. 1998) . . . . .     37

*United States v. Copeland*, 143 F.3d 1439 (11th Cir. 1998) . . . . . . . . .     22

*United States v. De La Cruz*, 514 F.3d 121 (1st Cir. 2008) . . . . . . . . . .     54

v

*United States v. Deutsch*, 987 F.2d 878 (2d Cir. 1993) . . . . . . . . . . . . . 64

*United States v. Dubon-Otero*, 292 F.3d 1 (1st Cir. 2002) . . . . . . . . . . 18, 21

*United States v. Edgar*, 304 F.3d 1320 (11th Cir. 2002) . . . . . . . . . . . 21

*United States v. Ellis*, 951 F.2d 580 (5th Cir. 1991) . . . . . . . . . . . . . . . 68

*United States v. Falcioni*, 45 F.3d 24 (2d Cir. 1995) . . . . . . . . . . . . . . 71

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013) . . . . . . . . . . . . 3, 15, 25, 26, 31, 33, 42, 44

*United States v. Flores-Rivera*, 56 F.3d 319 (1st Cir. 1995) . . . . . . . . 32

*United States v. Gamache*, 156 F.3d 1 (1st Cir. 1998) . . . . . . . . . . . . . 54

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) . . . . . . . . . . . . . 44, 50

*United States v. Gatling*, 96 F.3d 1511 (D.C. Cir. 1996) . . . . . . . . . . . 38

*United States v. Gaudin*, 515 U.S. 506 (1995) . . . . . . . . . . . . . . . . . . . . 30

*United States v. Gupta*, 463 F.3d 1182 (11th Cir. 2006) . . . . . . . . . . . 64

*United States v. Hawkins*, 777 F.3d 880 (7th Cir. 2015) . . . . . . . . . . . 47

*United States v. Innarelli*, 524 F.3d 286 (1st Cir. 2008) . . . . . . . . . . . 72

*United States v. Jadlowe*, 628 F.3d 1 (1st Cir. 2010) . . . . . . . . . . . . . . 30

*United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998) . . . . . . . . . . 38

*United States v. Kenney*, 756 F.3d 36 (1st Cir. 2014) . . . . . . . . . . . . . . 65

*United States v. Mariano*, 983 F.2d 1150 (1st Cir. 1993) . . . . . . . . . . . 34

*United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015) . . . . . . . . . .    21, 23

*United States v. Medley*, 913 F.2d 1248 (7th Cir. 1990) . . . . . . . . . . . . .    41

*United States v. McDonough*, 727 F.3d 143 (1st Cir. 2013) . . . . . . . . . 37, 47, 49,
50

*United States v. Muhammad*, 120 F.3d 688 (7th Cir. 1997) . . . . . . . . . .    71

*United States v. Munchak*, 527 Fed. App'x 191(3d Cir. 2013) . . . . . . . .    44

*United States v. Nelson*, 732 F.3d 504 (5th Cir. 2013) . . . . . . . . . . . . . .    70

*United States v. Page*, 521 F.3d 101 (1st Cir. 2008) . . . . . . . . . . . . . . .    55

*United States v. Pennue*, 770 F.3d 985 (1st Cir. 2014) . . . . . . . . . . . . .    27

*United States v. Pinson*, 860 F.3d 152 (4th Cir. 2017) . . . . . . . . . . . . .    21, 22

*United States v. Prigmore*, 243 F.3d 1(1st Cir. 2001) . . . . . . . . . . . . . .    54

*United States v. Rodriguez*, 735 F.3d 1 (1st Cir. 2013) . . . . . . . . . . . . .    18

*United States v. Sasso*, 695 F.3d 25 (1st Cir. 2012) . . . . . . . . . . . . . . . .    38

*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) . . . . . . . . . . . . . . 43, 47, 49

*United States v. Sepulveda*, 115 F.3d 882 (11th Cir. 1997) . . . . . . . . . .    64

*United States v. Shinderman*, 515 F.3d 5 (1st Cir. 2008) . . . . . . . . . . . .    53

*United States v. Stergios*, 659 F.3d 127, 136 (1st Cir. 2011) . . . . . . . . .    71

*United States v. Symonevich*, 688 F.3d 12 (1st Cir. 2012) . . . . . . . . . . .    38

*United States v. Sun-Diamond Growers of California*,
526 U.S. 398 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31, 51

vii

*United States v. Urciuoli*, 613 F.3d 11 (1st Cir. 2010) . . . . . . . . . . . . . .    49

*United States v. Vazquez-Botet*, 532 F.3d 37 (1st Cir. 2008) . . . . . . . . .    60, 69

*United States v. Vazquez-Rivera*, 665 F.3d 351 (1st Cir. 2011) . . . . . .    66

*United States v. Vega*, 813 F.3d 386 (1st Cir. 2016) . . . . . . . . . . . . . .    59

*United States v. Woodward*, 149 F.3d 46 (1st Cir. 1998) . . . . . . . . . . .    49

*Vance v. Ball State Univ.*, 570 U.S. 421 (2013) . . . . . . . . . . . . . . . . . .    40

*Webster v. Fall*, 266 U.S. 507 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . .    27

*Yates v. United States*, 135 S. Ct. 1074 (2015) . . . . . . . . . . . . . . . . . . .    20

## Statutes and Rules

18 U.S.C. §666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    *passim*

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    58

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    58, 59

## Guidelines Provisions

USSG §2B1.1, App. Note 3(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    71

USSG §2C1.1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    60, 61

## Other Authorities

S. Rep. No. 98-225 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

## NOTE ON CITATIONS TO THE RECORD

Citations to the Addendum to this Brief are designated as "Add:___." Citations to the Appendix are designated as "App:___." Matters appearing in the Sealed Appendix are cited as "SApp:___."

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This appeal arises from a judgment of the district court entered on April 12, 2018, Add:1, and Bravo's notice of appeal was filed the same day. App:3613. The district court had jurisdiction under 18 U.S.C. §3231. This Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742.

## STATEMENT OF ISSUES PRESENTED

1. Whether the evidence sufficed to prove that Puerto Rico "receive[d] . . . benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, or other form of Federal assistance," 18 U.S.C. §666(b), where the only evidence regarding this essential element of the offense was that Puerto Rico "received over $4.7 billion in federal funds."

2. Whether the district court erred in instructing the jury that it was only required to find that Puerto Rico "received funds of more than $10,000."

3. Whether the evidence sufficed to prove that the Las Vegas trip was a quid-pro-quo bribe.

4. Whether the instructions to the jury were insufficient to explain the difference between a quid-pro-quo bribe and a gratuity.

5. Whether the district court erred in declining to instruct the jury that it was required to find that Martinez and de Castro Font changed their positions on the

legislation at issue.

6. Whether the district court erred in telling the jury that it could not consider the merits of the legislation for any purpose.

7. Whether the district court erred in excluding defense evidence critical to rebut the government's theory of Bravo's motivation to commit bribery.

8. Whether the district court erred in calculating Bravo's guidelines offense level.

## STATEMENT OF THE CASE

### Procedural Background

Juan Bravo was charged in 2010 with, among other charges, violation of 18 U.S.C. §666(a)(2)), the federal program bribery statute. The charges centered around a trip to Las Vegas that Bravo, the owner of a successful Puerto Rico security company, Ranger American, took with codefendant Hector Martinez and Jorge de Castro Font, then members of the Puerto Rico Senate, for which Bravo paid some of their expenses. The government alleged that the trip was a bribe to the two senators in exchange for their support for two pieces of legislation, Senate Projects 410 and 471. Bravo contended then, as he does now, that he had promoted the two bills because of their merits and that he had not acted with the required corrupt intent to exchange things of value for official actions by the two senators and that the trip was,

at most, a gratuity, which did not violate §666.

In 2011, Bravo was convicted on the §666 count, but on appeal, this Court vacated his §666 conviction because §666 criminalizes only bribery and not gratuities and, because the evidence could have supported conviction on either a bribery or a gratuities theory, it was impossible to tell that the jury had not convicted Bravo based on a legally invalid theory. *United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013). Thereafter, Bravo argued in the district court that retrial on the §666 count would violate the double jeopardy clause. This Court disagreed, *United States v. Bravo-Fernandez*, 790 F.3d 41 (1st Cir. 2015), as did the Supreme Court. *Bravo-Fernandez v. United States*, 137 S. Ct. 352 (2016).

The §666 count was tried again in May 2017. Bravo moved for a judgment of acquittal at the end of the government's case, App:1951-2021, and at the end of all the evidence, App:2830-31; the former was denied by the district court, App:2021; the latter was reserved. App:2831. The jury returned a verdict of guilty, and Bravo again moved post-judgment for a judgment of acquittal. App:3119. That motion too was denied. Add:8-28.

On April 12, 2018, Bravo was sentenced to a term of 48 months. Bravo's motion for bail pending appeal remains pending in the district court.

**Trial Evidence**

The trial evidence centered on two pieces of legislation before the Puerto Rico Senate which Juan Bravo supported—Senate Projects 410 and 471—and the trip to Las Vegas which Bravo took on May 13, 2005, with Martinez and de Castro Font. This Statement of Facts will outline the evidence as to these key components of the government's case; other evidence will be addressed in the sections of the brief to which it is most relevant.

**Senate Project 410**

In 2004, before Martinez took office, a subcommittee of the International Council of Shopping Centers ("ICSC"), of which Bravo was a member, drafted a proposed code of conduct bill to address increasing crime at shopping centers, which passed the legislature but was vetoed by the governor. App:2064, 2115-16, 2163-64. Shortly after Martinez took office in January 2005, Victor Rivera and Jose Velazquez, Martinez's legal advisors, advised Martinez that he should begin by looking at bills proposed by prior legislatures that were good for the people of Puerto Rico but had not been enacted. App:928, 934, 1021-33, 2382. In February 2005, an ICSC member told Martinez, who had become the chairman of the Senate Public Safety Committee, of the bill's purpose and of ICSC's efforts to get it passed, App:2172, and on February 23, 2005, Bravo and other ICSC members delivered to Martinez a draft of

proposed legislation which later became Senate Project 410 ("410"). App:2069-70.[1] It is common for private citizens and groups to bring proposed bills to the legislature. App:1105-06, 2260-61, 2379-80. The proposed legislation would have permitted shopping centers to institute codes of conduct under which they could bar individuals who engaged in prohibited conduct on their premises. App:939, 956, 1114. The bill did not require the expenditure of funds by the Puerto Rico government, nor would it have resulted in increased revenues for Ranger American. App:1114, 2135-36, 2150, 2397. Martinez gave the proposal to Velazquez to review and redraft in correct Senate format. App:859-60, 2389-90. Martinez, Rivera, and Velazquez supported 410 from the outset. App:1000-01, 2562.[2]

On March 2, 2005, 410 was submitted to the Senate. App:858.[3] The Secretary of the Senate, not Martinez, decided to what committee proposed legislation would

---

[1] Rivera testified that in late February 2005 Bravo brought a draft of 410 to Martinez's office and gave the draft to him, not Martinez. App:852-53. Three members of the ICSC testified that they had gone as a group to Martinez's office to present the draft and that Rivera was not present. App:2068-72, 2125-27. Velazquez testified that the draft that Martinez gave him to work on came from the ICSC, not Bravo. App:2389-90, 2540-42.

[2] Telephone records indicated that Bravo and Rivera had telephone conversations on February 28, April 4, May 14, 2005, and Bravo and Martinez on May 17, 2005. App:1334-35.

[3] Martinez had not instructed Velazquez that 410 was to be submitted on that date. App:2397.

be assigned, App:938; 410 was assigned to Public Safety and two other committees. App:959-62. Martinez did not request that the bill be assigned to his committee. App:2271. On April 12, 2005, the Public Safety Committee held a public hearing on 410, at which Bravo, as well as others, testified. App:893-97. Notifying senators of the hearing and inviting public comment and submissions are all technical functions decided and performed by staff, App:2401-02; the director of the committee, not Martinez, was responsible for scheduling the public hearing. App:2405. Velazquez was never given instructions regarding whom to invite or not invite to hearings or from whom to solicit comments on proposed legislation. App:2531-32.

After the hearing, Velazquez prepared a positive report, App:2522, but the bill could not advance further unless all three committees to which it was referred voted favorably. App:962-63, 2398. The Public Safety Committee unanimously approved 410 on May 12, 2005; the Commerce Committee followed suit on May 13, 2005, and the Judiciary Committee on May 18, 2005. App:977-78, 2406-07.[4] On May 18, 2005, 410 was submitted to de Castro Font's Rules and Calendar committee for submission to the full Senate, where it passed on May 23, 2005, by a vote of 24-1. App:906-07,

---

[4] Martinez did not invoke the fast-track process which would have avoided the need for 410 to be approved by all three committees, App:976, even though he had submitted another bill the same day that he had fast-tracked. App:2289-92.

978-79, 1159, 2408.

During the Senate process, a senator proposed an amendment to 410 that Martinez supported even though Bravo did not. App:2412, 2416. 410 also passed the House but was vetoed by the governor. App:2418.[5]

## Senate Project 471

Bravo and Miguel Portilla formed the Security Entrepreneurs Association ("SCEA"), to combat the problem of large numbers of security companies that enjoyed an unfair competitive advantage because they were not complying with the laws regarding employee wages, hours, and insurance. App:1115-18, 1489-90, 1494, 1532. Under Law 108, the Puerto Rico law governing the security industry, which had been in effect since 1965 and was in need of updating, a corporation wishing to conduct a security business in Puerto could be licensed only if its "senior executive officer" was a licensed private detective, App:3393, 3400, and another serious issue was the practice of companies' "renting" licenses—paying a lower level employee to use his license and falsely claiming that the senior executive officer was licensed. App:1550-54.

---

[5] A code of conduct bill was eventually enacted in 2009, four years later. At a meeting about the successful enactment, Bravo attributed its success to de Castro Font and told Portilla that he had no idea how much it had cost him. App:1524. Portilla had no idea what Bravo meant by this remark. App:1614.

In 2001, then-Rep. Severo Colberg learned of the fraudulent "renting" of licenses and convened an investigation. App:1566, 2342-44. Colberg's commission held hearings, at which Bravo and Portilla testified. App:1565. The culmination of the commission's work was House Bill 4756, which sought, among other things, to clarify 108 by adding a definition of "Chief Executive Officer": "the officer at the highest administrative and operational level of the security agency and/or corporation." App:2349, 3415. Under 4756, corporations "incorporated in the United States or in the Commonwealth of Puerto Rico" could be licensed to conduct a security business "so long as its Chief Executive Officer holds a valid Private Detective license issued to him or her by the Superintendent of Police." App:3416.[6] The Chief Executive Officer was required to be "a citizen of the United States of

---

[6] Whether it was the head of the parent company who was required to be licensed or instead the head of the subsidiary incorporated in Puerto Rico is important because the government proceeded on the theory that Bravo's intention in securing the passage of 471 was to eliminate Ranger's competition in the armored car business. Ranger provided armored car services, as did Brinks and Loomis, with Ranger having a majority of the armored car business in Puerto Rico; while Bravo had a private detective's license, the main executive officers of Brinks and Loomis did not. App:1503, 1542, 1665. Loomis Puerto Rico was a Puerto Rico corporation, App:1685, and thus eligible for licensing if its chief executive officer was a licensed private detective. In 2005, Loomis was not complying with 108, as its detective license was held by a truck driver. App:1666, 1698-1700, 1703. Ranger brought suit in 2005 to enforce compliance by Loomis with the licensing requirement. *Id.* Ultimately, a Puerto Rico Court ruled that Loomis was operating illegally but permitted it to continue to operate while Medina completed his qualification for licensing. App:1667-69, 1709.

America and a resident of . . . Puerto Rico." App:3415, 3417. This language was drafted by the committee and was not added at the request of any private party. App:1578, 2360, 2367. 4756 was unanimously approved by the committee in 2004 and then passed the House, but time expired in the Senate before it could be voted on. App:1587, 2361.

In early March 2005, Bravo, representing SCEA, provided Martinez with a proposed bill amending 108, App:861-62, 989, and met with Martinez, Velazquez, and Rivera regarding the proposed legislation, which became Senate Project 471, on March 8, 2005. App:872-73, 980. The primary purpose of the proposed legislation was to require compliance with the law so that all security companies would compete on the same terms and to help those employed by security companies achieve fair wages and benefits, not to eliminate competition. App:862, 988, 1492-94, 1554, 1557, 1638, 1641.

As with 410, Martinez asked Velazquez to work on the drafting of 471. App:2420-22. Velazquez had worked on prior efforts to update 108 and shared with Martinez his knowledge of the problems with 108 that his research had revealed, such as unlicensed senior executives and unfair wage practices, and of prior bills that had been introduced. App:2423-28; *see* App:988-89. Velazquez reviewed the Colberg commission report in drafting 471 and gave Martinez a copy of the report. App:2434,

3437. Velazquez told Martinez that he should support 471. App:2562. Velazquez did not discuss the drafting of 471 with Bravo. App:2484-85.

Similarly to 4756 on which it was modeled, 471 authorized the licensing of private security agencies that were registered to do business in either Puerto Rico or the United States, App:3348, 3351, and required that the licensing application be submitted by the "Main Executive Officer," defined as "that officer of highest rank, in management, administration and operations of the security agency and/or corporation," App:3350. That person was required to have a private detective license and to be a citizen or resident of the United States and legally authorized to work in Puerto Rico. App:3352. While Portilla testified that he understood this language to refer to the head of the corporation in Puerto Rico, App:1636, Nestor Medina, the head of Loomis Puerto Rico, testified that he, Loomis, and Brinks believed that 471 would require the head of the foreign parent company to be licensed, a requirement with which they would be unable to comply. App:1670-73, 1718-19.

Martinez was fully committed to 471 well before the bill was submitted to the Senate on March 18, 2005, and well before there was any talk of a trip to Las Vegas. App:1001, 1105-06, 1115. There was no significance to the date of that submission. App:2455-56. The Public Safety Committee held a public hearing on 471 on April 20, 2005, at which Bravo, representing Ranger and SCEA, and others appeared in support

of the bill. App:897-903, 993. Velazquez referred to the Colberg commission report in deciding whom to invite to the public hearing on 471, which was held on April 21, 2005. App:2453. The committee voted unanimously in favor of 471. App:995. 471 passed the Senate on May 17, 2005, by a vote of 26-1. App:904-05, 996. As with 410, Martinez did not push for 471 to move faster than any other bill, nor did Velazquez ever see him pressuring anyone to vote for either bill. App:2457.

### The Las Vegas Trip

In early 2005, Bravo and his friends Leonardo Campo and Pepe Llama decided to go to a fight in Las Vegas featuring a Puerto Rican boxer on May 14, 2005, if Campo could get tickets through his contact with the fight promoter. App:1390, 2219-22. A few days later, Bravo asked Campo if he could get four tickets. App:1356, 1390-91, 1395-96. A fourth friend, Ricardo Carillo, was also to attend. App:1358, 1393. The tickets were $1,000 apiece, and Bravo paid with a Ranger check dated March 2, 2005, the date by which Campo's ticket contact told him that payment had to be made. App:1362, 1410-11.[7] Afterwards, however, Bravo and Llama learned that the fight conflicted with a boat race in which they were involved. Bravo initially believed that the race would prevent their attendance at the fight, but Llama urged

---

[7] On March 1, 2005, Bravo called Campo and made a number of calls to Carillo. App:1372, 1409. Bravo's telephone records also indicated that he made calls to Martinez and de Castro Font on March 2, 2005. App:1372-76.

11

Bravo to go to Las Vegas without him. App:2228-30, 2249. Then Carillo was injured in a motorcycle accident and was unable to attend. App:1366.

Victor Rivera testified that in late March or early April 2005, well after both 410 and 471 had been submitted to the Senate, he overheard a discussion between Bravo, Martinez, and de Castro Font of a trip to Las Vegas. App:877-79, 1000-01.

Bravo booked a business class flight for himself from San Juan to Las Vegas on March 16, 2005. App:1241. On April 1, 2005, Bravo booked rooms in his own name at the Bellagio and the Mirage in Las Vegas. App:1307-08. On April 21, 2005, Bravo reserved a room at the Mandalay Bay in Las Vegas. App:1311. At some point, Bravo's secretary made first class flight reservations for Bravo and Martinez, App:1270-72, but there was no evidence regarding who actually paid for the flights. *See* App:2582-90. Carlos Diaz, de Castro Font's bagman,[8] testified that a Puerto Rico businessman, Filiberto Lebron, paid for plane tickets for the trip for him and de Castro Font. App:674-75, 721, 752. On May 5, 2005, Bravo reserved two additional rooms at Mandalay Bay, paying for the first night. App:1312. De Castro Font's credit card was used to pay for the second night for both his and Martinez's Mandalay Bay rooms. App:1824, 1868-70.

---

[8] De Castro Font had a long history of pressuring people to give him money, money that was picked up by Diaz. App:718, 727, 744.

Bravo, Martinez, and de Castro Font flew first class to Las Vegas on May 13, 2005. App:1201-07, 1213-22. During the trip, Bravo, de Castro Font, Martinez, and Diaz had dinner in a Las Vegas restaurant, payment for which Bravo put on his credit card, App:680; there was no discussion of the legislation at dinner. *Id.* They attended the fight on May 14, 2005, and the next day flew to Miami, where they spent the night before returning to San Juan the next morning. App:682-90. Bravo paid for the Miami hotel rooms, which were reserved on May 9. App:1774-77.

## SUMMARY OF ARGUMENT

I(B)(1)-(2). The text of §666 unequivocally requires that the entity of which the bribe recipient is an agent receive more than $10,000 in "*benefits* in excess of $10,000 *under a Federal program* involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance" (emphasis added). The only evidence presented at trial on this element of the offense was a stipulation that Puerto Rico received $4.7 billion in federal *funds* during the operative period. The statutory language, the legislative history, and judicial precedent all demonstrate that "funds" are not the same as "benefits," and that §666 is only satisfied by proof of the latter. The stipulation did not suffice to prove that Puerto Rico received more than $10,000 in federal *benefits*.

Moreover, the stipulation does not even mention an additional essential

element, that the benefits be derived from a "*Federal program* involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance" (emphasis added). Here, the government presented *no evidence* identifying any federal program under which the payments were made, the entity within Puerto Rico receiving the monies, or the purposes for which the payments were made and used. There was, therefore, no evidence to permit the jury to conduct the analysis required to determine whether the monies were in fact federal program benefits. Because the government failed utterly to prove this essential element of the offense, Bravo's convictions should be reversed.

I(B)(3). At minimum, Bravo's conviction should be vacated because the district court erroneously instructed the jury that it need find only that Puerto Rico "received funds of more than $10,000." Because "funds" are not the equivalent of federal program benefits, this instruction failed to inform the jury of essential elements of the offense. The error was not harmless, as a properly instructed jury could not have found that Puerto Rico received more than $10,000 in federal program benefits.

I(C). The evidence was insufficient to prove that the Las Vegas trip was a quid-pro-quo bribe given by Bravo in exchange for legislative action by Martinez or de Castro Font as opposed to, at most, a gratuity, *i.e.*, "a reward for some future act that the public official will take (and may have already determined to take), or for a past

14

act that he has already taken." *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013), that did not violate §666. Bravo's conviction should, accordingly, be reversed.

II(B).  The central disputed issue was whether the Las Vegas trip was offered and accepted as a quid-pro-quo bribe or whether, instead, the trip was, at most, a gratuity and, hence, outside the scope of §666. The jury instructions failed to provide the jury with adequate guidance regarding how to draw this critical distinction.  While the charge told the jury that things of value given to "curry favor," "cultivate a friendship," or "express gratitude" were not bribes, it failed to tell the jury that there was another category of payments—gratuities—that do *not* violate §666. The absence of the requested instruction left a gaping hole in the jury's understanding of both the *mens rea* and *actus reus* of the §666 offense: that an agreement to give/accept a gratuity, even if made before the official acts have been performed, can nonetheless be something other than a bribe and that an intent limited to the giving/receiving of that gratuity is not a corrupt intent within the meaning of §666. Because the evidence was consistent with a gratuity theory, the error was not harmless.

II(C).  Under the circumstances of this case, where it was critical that the jury be able to differentiate between bribes and gratuities and there was no direct evidence of a quid pro quo and no evidence that Martinez or de Castro Font did other than what they would have done anyway without the trip to Las Vegas, the jury should have

15

been instructed that the government was required to prove that the payment was intended to cause the recipient to change an official position that he would otherwise have taken or to take an official action that they would not otherwise have taken but for the payments. Defendants requested that the jury be so instructed, and it was error for the court to decline to so instruct.

II(D).  The court erred in instructing the jury that it was not to consider the merits of the legislation for any purpose. Whether Bravo was motivated to advocate the passage of 410 and 471 and to petition legislators in a position to advance the legislation because he believed that they were good laws was directly relevant to the question of whether he acted in good faith and without corrupt intent. In telling the jury that it could not take such evidence into consideration in reaching its verdict, the instructions were highly prejudicial error which fatally compromised Bravo's good faith defense.

III. The government, from the beginning of its opening statement through its closing argument, sought to portray Bravo as a greedy businessman willing to commit bribery to put his competition out of business through the passage of 471. After eliciting from Nestor Medina his interpretation of the meaning of 471 and the consequences of its passage for Loomis, the government vigorously objected to defense efforts to elicit witness testimony that would have interpreted 471 (or its

direct predecessor) to require only the head of the Puerto Rico security business to be licensed; so interpreted, 471 would not have required anything of Loomis that existing law did not. In excluding the testimony of Severo Colberg on this point and limiting Bravo to a single question to Velazquez, the district court deprived Bravo of important evidence to rebut the government's theory of his motivation to commit bribery.

IV. The district court erred in finding that the benefit to be received as the result of the bribes was the net of Loomis' 2005 income from its armored car business, which resulted in a 14-level adjustment to Bravo's offense level. The foundation for this finding was Medina's testimony regarding his interpretation of 471 and what that would have meant for Loomis *had his interpretation been correct*. Neither that testimony nor any other testimony adduced at trial provided a reliable basis for a conclusion that 471 would have put Loomis out of business. There was also no basis for a finding that Bravo reasonably expected that, as the result of the trip, 471 would pass, put Loomis out of business, and give Ranger all of Loomis' 2005 armored car business. Because Bravo's offense level should, therefore, be 18 rather than 32, the matter should be remanded for resentencing.

## ARGUMENT

## I. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT BRAVO'S CONVICTION.

### A. Standard of Review.

This Court reviews the denial of Bravo's Rule 29 motion *de novo. United States v. Dubon-Otero*, 292 F.3d 1, 6 (1st Cir. 2002), considering "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." *United States v. Rodriguez*, 735 F.3d 1, 7 (1st Cir. 2013).

### B. The Evidence Failed to Prove That an Entity of the Puerto Rico Government Received More than $10,000 in Federal Program Benefits.[9]

Section §666 contains several essential jurisdictional elements, without proof of which the alleged conduct is not a federal crime. At issue here is the requirement that Martinez and de Castro Font have been agents of an entity that "receive[d] . . . *benefits* in excess of $10,000 *under a Federal program* involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."§666(b) (emphasis added). The sole evidence as to these essential elements was the following

---

[9] This Court reviews *de novo* "the question of what type of transactions constitute benefits under §666." *Dubon-Otero*, 292 F.3d at 6.

18

stipulation:

> The parties hereby stipulate that in fiscal year 2005 the Commonwealth of Puerto Rico received more than $10,000 in federal *funding*. Specifically, from October 1, 2004, to September 30, 2005, the Commonwealth of Puerto Rico received over $4.7 billion in federal *funds*.

App:298, 1493 (emphasis added).[10] Because the Supreme Court has expressly rejected the equation of federal "funds" with federal "benefits," *Fischer v. United States*, 529 U.S. 667 (2000), and because there was no evidence from which the jury could find that the funds that Puerto Rico received from the federal government were "benefits" within the meaning of §666 or that they were provided under a "federal program," as that term is defined for purposes of §666, Bravo's conviction should be reversed.

### 1. The stipulation did not satisfy the government's burden of proof.

In *Fischer v. United States*, 529 U.S. 667 (2000), the Court, while concluding that the payments at issue were "benefits" within the meaning of §666(b), added an important caveat:

> Our discussion should not be taken to suggest that federal funds disbursed under an assistance program will result in coverage of all recipient fraud under §666(b). Any receipt of federal funds can, at some level of generality, be characterized as a benefit. *The statute does not employ this broad, almost limitless use of the term. Doing so would turn almost every act of fraud or*

---

[10] At the outset of the trial, the defense explicitly stated that its stipulation did *not* encompass a stipulation that the $10,000 federal program benefits element had been satisfied. App:531.

*bribery into a federal offense, upsetting the proper federal balance.*

*Id.* at 681 (emphasis added). The Court expressly rejected the government's "broader position" that the sole determinant should be "whether the Federal Government was the source of the payment." *Id.* at 677.[11] Instead, the Court stated, to ensure that the federal payments at issue fall within the bounds of the "benefits" requirement of §666 and the limits of federalism, courts must examine the "structure, operation, and purpose" of the federal program under which the payments are made and the "conditions under which the organization receives the federal payments." *Id.* at 681.[12]

These limitations are important. The federal government "possesses only limited powers" and "can exercise only the powers granted to it." *Bond*, 134 S.Ct. at 2086. Congress' authority to enact §666 derives from the Spending Clause, *Sabri v. United States*, 541 U.S. 600, 605 (2004), and *Fischer*'s limiting construction of "benefits" was necessary to ensure that application of §666 remained within

---

[11] The need to avoid federal encroachment into state prerogatives has been a consistent refrain of recent Supreme Court decisions. *See, e.g., McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016); *Bond v. United States*, 134 S. Ct. 2077, 2083, 2091 (2014); *Jones v. United States*, 529 U.S. 848, 858 (2000).

[12] Even where the federal/state balance was not at issue, the Supreme Court has cautioned against reading federal criminal statutes too expansively. *See, e.g., Marinello v. United States*, 138 S.Ct. 1101, 1106 (2018); *Yates v. United States*, 135 S. Ct. 1074, 1079 (2015)(plurality); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005).

permissible constitutional bounds.

> [T]o constitutionally cabin §666 courts must evaluate a federal program's "structure, operation, and purpose" to determine if the federal receipts qualify as benefits. *Failure to conduct this necessary investigation violates* Fischer's *admonition that §666 is not a boundless statute that applies to virtually every state bribery or fraud case.*

*United States v. McLean*, 802 F.3d 1228, 1240 (11th Cir. 2015)(emphasis added).

*See, e.g., United States v. Edgar*, 304 F.3d 1320, 1325 (11th Cir. 2002)("We are persuaded that [*Fischer*'s] reference to 'the proper federal balance' demonstrates its cognizance of potential constitutional limitations upon the application of § 666"); *United States v. Pinson*, 860 F.3d 152, 166 (4th Cir. 2017)("Because any receipt of federal funds could at some level of generality be characterized as a benefit and because the statute does not employ this broad, almost limitless use of the term, the [*Fischer*] Court provided guidelines to distinguish between covered federal payments ('benefits') and non-covered payments").

Since *Fischer*, courts, including this one, have, when presented with the issue of whether payments made to an entity were "benefits" under a "federal program" within the meaning of §666, carefully conducted the analysis prescribed in *Fischer* in making their determination. For example, in *Dubon-Otero*, this Court framed the issue as whether an entity's "receipt of federal monies . . . constituted receipt of federal benefits," 292 F.3d at 6, indicating its recognition that "federal monies" and

"federal benefits" are not the same thing and that further inquiry is required. To conduct that further inquiry, the Court turned to the standard articulated in *Fischer*, concluding that the payments at issue were federal program benefits under §666. *See, e.g., Pinson*, 860 F.3d at 166-67 (applying *Fischer* standard and concluding that the federal payments were not federal program benefits); *United States v. Bahel*, 662 F.3d 610, 626-28 (2d Cir. 2011)(conducting *Fischer* analysis and concluding that federal payments to the United Nations were federal program benefits).

Here, the government presented nothing other than the gross amount of federal funding received by Puerto Rico in FY 2005. It presented no evidence identifying any federal program under which the payments were made, the entity within Puerto Rico receiving the monies, or the purposes for which the payments were made and used, and thus no evidence to permit the analysis required under *Fischer* and *Dubon-Otero* to be conducted at all. The legislative history of §666 itself makes it clear that the concept of "federal program" "is not unlimited," and defines the term "federal program" as requiring "that there must exist a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives." S. Rep. No. 98-225 at 370 (1984), *quoted in United States v. Copeland*, 143 F.3d 1439, 1441-42 (11th Cir. 1998)(concluding pre-*Fischer* that federal payments to Lockheed were not benefits). *See Bahel*, 662 F.3d at 626 ("federal program" for purposes of

§666 exists when "there is a specific statutory scheme that authorizes payments thereunder for the purposes of promoting or achieving the policy objectives of the United States").

Unless, at minimum, the federal program that provided the funds is identified, a court cannot even begin, as required by *Fischer*, to examine the "structure, operation, and purpose" of the federal program under which the payments are made and the "conditions under which the organization receives the federal payments." 529 U.S. at 681. Nor, critically, would the jury have any evidence before it based on which it could determine whether the essential federal program benefits elements of the offense had been proven.

A case in point is *United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015), in which the Court, on a considerably less sparse record than this one, held that the government failed to prove that the payments at issue were benefits within the meaning of §666. The Court began with the bedrock proposition that "[t]o protect against the infringement on the inherent powers of the state by federalizing traditional state offenses, the government is required to prove beyond a reasonable doubt each element of a criminal offense, . . . and the failure to do so is fatal to the case." *Id.* at 1230. Its task, therefore, was to "scrutinize the evidence to ensure that the government is not prosecuting a state act of bribery." *Id.* at 1231. From its review of

the relevant case law, which included an examination of this Court's *Dubon-Otero* decision, the Court derived the proposition that application of *Fischer*'s "structure, operation, and purpose" test was necessary "to constitutionally cabin" §666. *Id.* at 1240. After examining the trial evidence, the Court found "no evidence as to the 'structure, operation, and purpose' of the federal program that expended the money . . . ." *Id.* at 1244. The Court emphasized that

> it was the government's failure to produce evidence on this element that leaves us with no opportunity to examine the federal program's "structure, operation, and purpose." Indeed, absent from the government's proof was any evidence identifying the relationship between the program authorizing a disbursement of federal funds and the ultimate use of those funds at the local level.

*Id.* There was, therefore, the Court held, insufficient evidence in the record from which a reasonable jury could have found receipt of a federal program benefit. *Id.* at 1244.

The same was true in this case. The $4.7 billion in federal funding received by Puerto Rico may arguably have included monies that would readily be characterized as benefits under the *Fischer* standard, but the existence of an essential element of the offense cannot simply be assumed. It must be proven by the government. Having failed to produce *any* evidence regarding the federal programs that provided the funds, much less their "structure, operation, and purpose," the government failed to prove the essential federal program benefit element of the offense. Bravo's conviction

should be reversed.

## 2. This Court did not decide this issue in *Fernandez*.

The district court denied Bravo's Rule 29 motion with respect to this issue on the sole ground that "[t]he stipulation read to the jury incorporating language identical to the language reviewed by the *Fernandez* court satisfies the federal benefits element pursuant to section 666." Add:26. In this the court erred, as the issue raised in this appeal was neither presented nor decided in *Fernandez*. No issue was even raised in the first appeal as to whether the evidence at the 2011 trial sufficed to prove the federal program benefits element.

Instead, the issue before the Court in *Fernandez* was the "more nuanced" one of whether Martinez and de Castro Font were agents of the governmental entity receiving the federal monies. *See Fernandez*, 722 F.3d at 8-12. It was in this context that the Court referenced testimony that Puerto Rico "received over $4.7 billion in federal funds," and concluded that "[b]ecause Martinez and de Castro Font are agents of the Commonwealth, the evidence was sufficient to show that they are agents of a "government . . . [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program," *Id.* at 9. The Court's statement regarding the $4.7 billion in federal funds was, at most, dictum, an "observation[] in a judicial opinion or order that [is]'not essential' to the determination of the legal questions then before the

court." *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007), *quoting Municipality of San Juan v. Rullán*, 318 F.3d 26, 29 n. 3 (1st Cir.2003). "Dictum constitutes neither the law of the case nor the stuff of binding precedent." *Dedham Water Co. v. Cumberland Farms Dairy, Inc*., 972 F.2d 453, 459 (1st Cir. 1992). A conclusion that the federal program benefits requirement was satisfied was unnecessary to the Court's decision of the issue before it, *i.e.*, whether Martinez and de Castro Font were agents of the entities receiving the monies. That portion of the Court's opinion is not, therefore, binding precedent. *See, e.g., United States v. Birge*, 830 F.3d 1229, 1232-33 (11th Cir. 2016)(rule that one appellate panel may not overrule another does not apply to dicta); *Netsphere, Inc. v. Baron*, 799 F.3d 327, 333 (5th Cir. 2015)(same).

Had the Court been asked to decide whether the federal benefits element had been proven, it would necessarily, as it did in *Dubon-Otero*, have examined the evidence under the *Fischer* standard. No such discussion appears in *Fernandez*, as the Court was not asked to, and did not therefore, undertake the inquiry.[13] *Fernandez* is

---

[13] The critical issue of whether the $4.7 billion in federal "funds" were federal program benefits was not raised in the prior appeal because, given the very different evidentiary record at the first trial, a challenge to whether the federal program benefits elements had been proven would have been futile. At that trial, the government also introduced evidence showing that the Puerto Rico Senate's childcare food program received $20,000 a year in federal benefits for the relevant years. Based on that evidence, the district court denied defendants' Rule 29 motions because "[t]he

not, therefore, controlling. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). *See, e.g., United States v. Starks*, 861 F.3d 306, 322-23 (1st Cir. 2017)(language of prior First Circuit opinion was non-binding dicta because the prior decision "did not address the precise issue before th[e] panel"); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (noting that when a court has "never squarely addressed the issue, and ha[s] at most assumed" an answer, the court is "free to address the issue on the merits").[14]

### 3.    At minimum, the erroneous instruction requires a new trial.[15]

Over defendants' objection, the court instructed the jury that it was required to find only that "the Puerto Rico Government . . . received funds of more than

---

federal assistance received by the Senate of Puerto Rico for childcare program clearly qualifies as a 'benefit' provided under a federal program." Doc. 588 at 25-26. Defendants expected that the same evidence would be forthcoming at this trial. *See* App:166. For whatever reason, at the 2017 trial, the government elected to omit the childcare program evidence and rely solely on the generalized $4.7 billion funding stipulation.

[14] Bravo also adopts the arguments set forth in Section I of Brief of Appellant Hector Martinez.

[15] "When—as in this case—an appellant's claim is that the trial court's jury instructions misstate the law, appellate review is ordinarily *de novo*." *United States v. Pennue*, 770 F.3d 985, 989 (1st Cir. 2014).

$10,000." App:3071. This instruction effectively told the jury—erroneously— that this element of the offense had been satisfied. *See* App:3084-85 (court tells jury that it must accept stipulations as fact). Defendants objected to the instruction on the ground that "the definition of benefits, as it is used in the statute . . . which is a more limited definition, should have been used . . . as opposed to the more general term 'funds.'" App:3093; *see* App:177. The government responded that it was proper for the court to use the term "funds," as that term appears in the title of the statute. *Id.*[16] The instruction given embodied a clear error of law.

As the discussion in the preceding sections demonstrates, "funds" are not the same as "benefits." Were they the statutory equivalent, there would have been no need for the Supreme Court's *Fischer* analysis or the analysis conducted by this Court in *Dubon-Otero*, or the analyses conducted in other cases cited above. The simple receipt of federal funds would suffice. That is not, however, the law.

That the word "funds" appears in the title of the statute is of no moment. As an initial matter, §666's title does not simply refer to "funds." Instead, its title is "Theft or bribery *concerning programs receiving federal funds*" (emphasis added). The text of §666(b) specifies that the entity of which the bribe recipient is an agent must

---

[16] In its written requests for instructions, however, the government requested that the jury be instructed that §666 requires that the "Puerto Rico government . . . received benefits of more than $10,000 under any federal program . . . ." App:210.

28

receive "benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." Unless this circumstance exists, §666 is inapplicable.

Because "matters in the text which deviate from those falling within the general pattern [of the title] are frequently unreflected in the headings and titles," the "wise rule" has developed that "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Brotherhood. of R. R. Trainmen v. Baltimore & O. R. Co*., 331 U.S. 519, 528-29 (1947). *See, e.g., Telecommunications Regulatory Bd. v. CTIA-Wireless Ass'n*, 752 F.3d 60, 65 (1st Cir. 2014)("[T]urning to titles and section headings to divine the meaning of a statute is a practice [that] should not be indulged at the expense of the text itself"); *Massachusetts Ass'n of Health Maint. Organizations v. Ruthardt*, 194 F.3d 176, 180 (1st Cir. 1999)(same). Instead, "the title of a statute [is] of use only when [it] shed[s] light on some ambiguous word or phrase in the statute itself." *Carter v. United States*, 530 U.S. 255, 267 (2000). Where, as here, there is no ambiguity in the plain language of the statute, courts do "not consider the title of the Act in determining the correct construction." *Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co.*, 40 F.3d 492, 499 (1st Cir. 1994). Congress clearly set forth the "circumstance" that must exist before conduct may be punishable under §666; if that circumstance is not shown to exist, there is no

federal crime.

Here, however, the jury was not told of that circumstance, without proof of which it could not find Bravo guilty. The Fifth and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510 (1995). An erroneous instruction regarding an essential element of the offense "precludes the jury from making a finding on the actual element of the offense." *Neder v. United States*, 527 U.S. 1, 10 (1999). Because the error here was of constitutional magnitude, "the government bears the burden of proving that the error was harmless . . . beyond a reasonable doubt." *United States v. Jadlowe*, 628 F.3d 1, 21 (1st Cir. 2010), *citing Chapman v. California*, 386 U.S. 18, 24 (1967). The government cannot meet this burden. For the reasons addressed in the preceding sections, a properly instructed jury could not have found that Puerto Rico received more than $10,000 in federal program benefits.

**C.    No Reasonable Jury Could Conclude Beyond a Reasonable Doubt that the Las Vegas Trip Was a Quid Pro Quo Corruptly Given in Exchange for an Official Act.**

There is no dispute that Bravo paid some of the expenses associated with the

Las Vegas trip for Martinez and de Castro Font.[17] Rather, the dispute centered on the nature of his expenditures: were they a quid-pro-quo bribe given in exchange for the senators' action on 410 and 471 or instead, at most a gratuity? The distinction is critical: this Court held in *Fernandez* that §666 applies only to quid-pro-quo bribery and *not* to gratuities. In so doing, the Court carefully distinguished between the two:

> [F]or bribery, there must be a quid pro quo—a specific intent to give or receive something of value for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may have already determined to take), or for a past act that he has already taken.

*Fernandez*, 722 F.3d at 19, *quoting United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999). The Court continued:

> Although the timing of the payment may not provide a conclusive answer as to whether that payment is a bribe or a gratuity, the timing of the agreement to make or receive a payment may: one cannot agree to perform an act in exchange for a payment when that act has already been performed. *Therefore, if the agreement to exchange a thing of value for an act is made after that act has been performed, that agreement cannot properly be viewed as an agreement to offer or accept a bribe.*

*Id.* (emphasis added). Because the evidence here was insufficient to prove that

---

[17] Not, however, all the expenses: contrary to what the government told the jury in its opening statement, App:566-72, the evidence did not show that this was an "all expenses paid" trip. There was no evidence regarding who actually paid for the plane tickets, and there was uncontroverted evidence that de Castro Font used his credit card to pay for the second night of his and Martinez's stay at the Mandalay Bay. App:1824, 1868-70.

Bravo's trip expenditures were a quid-pro-quo bribe as opposed to a gratuity, Bravo's conviction should be reversed. In this context, it is particularly important to note that [i]f the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction."*United States v. Flores-Rivera*, 56 F.3d 319, 323 (1st Cir. 1995).

In concluding that the evidence was sufficient to prove bribery, the district court pointed to the following: (1) Martinez, with whom Bravo was not friends, was chairman of the Public Safety Committee, with the power to schedule hearings and decide who would testify before them; (2) Bravo delivered a draft of 410 to Martinez in late February 2005; (3) 410 was submitted to the Senate on March 2, 2005; (4) on March 2, 2005, Bravo purchased four tickets to the fight; (5) on March 2, 2005, Bravo called Martinez and de Castro Font; (6) Ranger American was the only private security firm invited to testify at the April 12, 2005, hearing; (7) the Public Safety Committee voted on 410 and 471 on May 12, 2005, and the next day Bravo, Martinez, and De Castro Font traveled to Las Vegas together; (8) a week after the trip, Martinez and de Castro Font voted in favor of 410. Add:15-17. Neither this nor any other evidence sufficed to permit a rational jury to find, beyond a reasonable doubt, that the Las Vegas trip was a quid-pro-quo bribe, as opposed to a gratuity

given to reward past or future conduct.

Martinez, with the encouragement and approval of Rivera and Velazquez, supported 410 and 471 from the outset. By the time Rivera overheard talk of the trip in late March/early April, Velazquez had advised Martinez to support both bills, Velazquez had studied and redrafted both bills, both 410 and 471 had already been submitted to the Senate, and Martinez was fully committed to their passage.[18] *See, e.g.*, App:1001-02, 1179, 2562-63. This evidence places the trip squarely in the category of a reward/gratuity for actions already taken or actions that Martinez had already decided to take in the future with respect to both pieces of legislation. *See Fernandez*, 722 F.3d at 20 (because Martinez "first took actions in support of . . . 410 and 471—such as submitting the bills to the Senate—weeks or months before the trip to Las Vegas, which is consistent with a gratuity theory," "the jury reasonably could

---

[18] The government sought to suggest that the trip was in the offing as early as March 2, 2005, the date of Bravo's check for the fight tickets, on which telephone records showed that Bravo called Martinez and de Castro Font, which also coincided with the submission of 410 to the Senate. There was, however, no evidence regarding the content of these brief calls. A later date is consistent with other trip arrangements: the last two Mandalay Bay reservations were not made until May 5, and the Miami hotel rooms were not reserved until May 9. App:1834-35, 1793. There was no evidence regarding when the flights were booked. While Diaz testified that de Castro Font knew he was going to Las Vegas before March 21, 2005, App:799, he also testified that he was given two sets of airline tickets—for himself and de Castro Font—by Tato Lebrun, App:675, not Bravo, so Diaz's testimony does not establish that de Castro Font was traveling to Las Vegas as *Bravo's* guest at that earlier date.

have found that the trip was a reward for that prior conduct, rather than the quid pro quo for Martínez's later support of the bills.").[19] An agreement made after the act has been performed "cannot properly be viewed as an agreement to offer or accept a bribe." *Id.* at 19.

There was also no evidence that there were any strings attached to Bravo's payment of expenses associated with the trip. *See, e.g., United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993)(in gratuity context, the giver "gives the gift without attaching any strings, intending it instead as a reward for actions the public official has already taken or is already committed to take."). Both the government and the court posited a relationship between legislative acts and various stages of the trip planning as indicative of bribery. For example, they found significance in the fact that Bravo's check for the fight tickets was dated the same day that 410 was submitted to the Senate, 410 and 417 were sent to the Senate the day before the trip, Martinez and de Castro Font voted for 471 the day after they returned for the trip and a week later voted for 410. *See* Add:16-17. This evidence does not, however, differentiate a bribe from a gratuity or establish the existence of an agreement to exchange official acts relating to 410 or 471 for the trip to Las Vegas. Indeed, the court instructed the jury

---

[19] Velazquez testified that it would be extraordinarily unusual for a senator not to vote in favor of legislation which he himself had submitted to the Senate. App:2457-58.

that "[i]t is not sufficient . . . that there is some connection in time or place with an official act." App:3078.

There was certainly no evidence from which the jury could infer that various components of the trip expenses were incurred piecemeal as the legislation progressed, *i.e.*, that Bravo doled out portions of the trip in stages to ensure that Martinez and de Castro Font did as they had promised or that Martinez or de Castro Font held their actions hostage against completion of the trip. The March 2 date of the checks was solely a function of the date when the source of the tickets required payment to be made, App:1410-11, and Velazquez testified that there was no significance to March 2 date for the submission of 410 to the Senate; Martinez did not instruct him to submit it on that date. App:2397. The date of the Senate vote on 410 was solely a function of the date on which the last committee to which it had been assigned voted on it; that did not happen until May 18, and it could not be submitted to de Castro Font's committee for submission to the full Senate until that date. App:2407-08. Similarly, none of the other dates to which the court and the government attached significance were shown to be more than coincidental.

In addition, the manipulations of the process in favor of Bravo that the government sought to suggest were shown by Velazquez's unrebutted testimony to be chimerical: scheduling hearings, calling for public comment, soliciting

submissions are all *staff* functions, conducted without consultation with Martinez, App:2400-02, 2452-53, the dates of the hearings of the Public Safety Committee on 410 and 471 were selected by the director of the Committee, not Martinez, App:2402-05, the staff decided whom to invite to appear at the committee hearings, and Velazquez used the Colberg report in making this decision, App:2275-76, 2452-53, *i.e.*, the decision to invite Bravo to appear at the 471 hearing but not, for example, Loomis, was made by staff, not Martinez. App:2531-32. In sum, there was *no* evidence that Martinez manipulated the legislative process on Bravo's behalf. Martinez did not "fast-track" 410, as he did with another bill he submitted the same day, which would have allowed 410 to skip the committee review process, App:2290-91, 2398-2400, and when an amendment to 471 was proposed in the Senate, Martinez supported it even though Bravo opposed it, App:2412, 2416, hardly the act of a man whose legislative action on the bill had been bought. Moreover, Bravo had to be convinced by Pepe Llama not to change his plans to go to Las Vegas because of a conflicting boat race, App:2228-30, 2249, which is markedly inconsistent with Bravo's having entered into a corrupt agreement with Martinez or de Castro Font to exchange the trip to Las Vegas for future official acts relating to the passage or 410 or 471.

    While it is true that corrupt agreements may be proven by circumstantial

evidence, *United States v. McDonough*, 727 F.3d 143, 153 (1st Cir. 2013), still, there must be evidence from which the jury can find such a corrupt agreement, *i.e.*, that the trip was a bribe in exchange for official acts, as opposed to a gratuity, beyond a reasonable doubt. The evidence here failed to provide the jury with a reasonable basis on which to differentiate between bribes and gratuities or to find the requisite quid pro quo, and its verdict should be set aside.[31]

## D. The Government's Proof of Other Elements of §666 Was Deficient as Well, Both Factually and as a Matter of Law.

Bravo adopts the arguments set forth in Section II of the Brief of Appellant Hector Martinez.

---

[31] This conclusion is not undermined by either the May 2008 conversation between Bravo and Carlos Diaz or the 2009 conversation between Bravo and Portilla. As to the former, that conversation took place three years after the fact, and while Bravo can be heard telling Diaz that Diaz and de Castro Font were being watched and should be careful, App:699, 708-10, nothing in the conversation elucidates what Bravo was referring to. There is no mention in the call of the Las Vegas trip or the legislative projects, and Diaz and de Castro Font had, over the years, engaged in a steady unrelated stream of criminality, App:727, 742-44, which by itself provides a full explanation for Bravo's remarks.

The 2009 Bravo-Portilla conversation related to a different piece of legislation, submitted by a different legislator, to a different legislature, four years later, and Portilla had no idea what Bravo meant by "cost." App:1614-15. Neither of these conversations support "an inference of guilt *of the offense charged*." *United States v. Candelaria-Silva*, 162 F.3d 698, 705 (1st Cir. 1998)(emphasis added).

## II. THE COURT'S INSTRUCTIONS TO THE JURY DENIED DEFENDANTS A FAIR TRIAL.[32]

### A. An Overview of the Court's Instructions.

The court told the jury that "[f]or [it] to find Defendant Bravo guilty of bribery," it was required to find five statutory elements, including that Bravo acted "corruptly with the intent to influence or reward an agent of the Puerto Rico Government . . . ." App:3070. The court did not, however, link "corruptly" with the bribery quid-pro-quo requirement, defining "corruptly" only as an act "performed voluntarily, deliberately, and dishonestly for the purpose of either accomplishing an unlawful end or result, or of accomplishing some otherwise lawful end or lawful result by any unlawful method or means." App:3071.[33] After reciting additional

---

[32] This Court "review[s] de novo questions about whether the instructions conveyed the essence of the applicable law," *United States v. Sasso*, 695 F.3d 25, 29 (1st Cir. 2012), and reviews for abuse of discretion "whether the instructions adequately explained the law." *United States v. Symonevich*, 688 F.3d 12, 24 (1st Cir. 2012).

[33] Courts have recognized that this generic definition of "corruptly" is insufficient in the §666 context and that "a correct definition of 'corruptly' must modify the 'to influence or reward' language in the court's instruction" and that a failure to link the two results in an "erroneous instruction on an essential element of bribery." *United States v. Jennings*, 160 F.3d 1006, 1020-21 (4th Cir. 1998). *See, e.g., United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002)("The 'corrupt' intent necessary to a bribery conviction is in the nature of a quid pro quo requirement"); *United States v. Gatling*, 96 F.3d 1511, 1522 (D.C. Cir. 1996)("Given the equation of bribery with a quid pro quo, 'corruptly' in the context of the bribery statute would appear to mean that the defendant accepts money with the specific intent of

statutory elements, the court offered the jury the following circular explanation: "To find that the thing of value was given, offered, or promised with a corrupt intent to influence or reward, you must find that Defendant Bravo gave, offered, or promised the thing of value, in part, to corruptly influence or reward Defendant Martinez for his official acts." App:3072.

The court then defined reward, once again leaving it entirely unmoored from the quid-pro-quo requirement, as "when a person promises a thing of value to a public official before the public official takes official action. Then, after the public official takes the action, the person gives the thing of value to the public official." App:3072. The jury could find a reward, the court continued, if it found that Bravo promised Martinez a trip to Las Vegas if "Martinez took action on Senate Projects 410 and/or 471" and then gave Martinez the trip "once . . . Martinez took action on" 410 and/or 471. *Id.*

The court then told the jury that the government "has met its burden under the first and second elements above," *i.e.*, the corrupt giving with intent to influence elements, *see* App:3071, "if you find beyond a reasonable doubt that Defendant Bravo gave, offered, or agreed to give the trip to Las Vegas corruptly with the intent to influence or reward one or more of several actions taken by Defendant Martinez

performing an official act in return").

39

in reference to Senate Projects 410 and/or 471 . . . ." App:3073. Thus, the court told the jury that it could find a corrupt offer to influence or reward without reference to the essential quid-pro-quo element.[34]

Only then, after ostensibly describing all the elements of the offense charged, did the court turn to the bribery quid-pro-quo requirement, telling the jury that

> [i]t is not sufficient that the thing of value is made to curry favor because of the official's position, cultivate a friendship or express gratitude, or that there is some connection in time or place with an official act that is promised to the giver; rather, there must be an agreement that the thing of value was offered by Defendant Bravo and accepted by Senator Martinez in exchange for a promise to perform an official act.

App:3078. At no time did the court link the quid-pro-quo requirement to either the corrupt intent element or the "influence or reward" language that it had liberally employed in defining the elements of §666. It is in the context of these disjointed and confusing instructions that Bravo's claims must be evaluated. *See Fernandez*, 722 F.3d at 16 ("[W]e look to the challenged instructions in relation to the charge as a

---

[34] At the outset of the case, the court rejected the defendants' request that a definition of bribery be included in its preliminary instructions to the jury, opting instead, at the government's urging, to limit its discussion of the elements of the offense to the statutory language. *See* App:527-30, 551-52. Thus, as the jury listened to the evidence, it had no understanding of the essential quid-pro-quo requirement. *See Vance v. Ball State Univ.*, 570 U.S. 421, 443 (2013)(preliminary instructions "allow [jurors] to understand, as the evidence comes in, how each item of proof fits into the framework that they will ultimately be required to apply").

whole, asking whether the charge in its entirety—and in the context of the evidence—presented the relevant issues to the jury fairly and adequately.").

### B. Failure to Fully Inform The Jury Regarding What Is Not a Bribe Under §666.

The instructions failed to provide the jury with adequate guidance regarding how to draw the critical distinction between bribery and gratuities. This failure is particularly acute in light of this Court's statements, based on the record at the first trial—a record substantially less favorable to the defendants than the record in this appeal—that "the evidence presented at trial could support a finding that the 'payment' Bravo gave and Martinez received constituted a gratuity." *Fernandez*, 722 F.3d at 20. *See id.* at 27 (same).

Courts have recognized that the distinction between bribery and gratuities, although appearing clear in theory, can "look somewhat hazy in real life." *Jennings*, 160 F.3d at 1014. *See, e.g., United States v. Medley*, 913 F.2d 1248, 1260 (7th Cir. 1990)("In practice," bribery and gratuities "have been difficult to distinguish"). To assist the jury in making this outcome-determinative distinction, defendants requested that the jury be instructed that bribery required the government to "prove beyond a reasonable doubt the existence of a *quid pro quo*," *i.e.*, "a specific intent to give or receive something of value in exchange for an official act," but

[a] gift is not a bribe, but is instead known as a gratuity, if it is merely a reward for some future act that the public official will take and may have already determined to take, or . . . a gift for a past act that he has already taken.

App:167-68. That being the case, "if the agreement to exchange a thing of value for an act is made after the act has been performed, that agreement cannot properly be viewed as an agreement to offer or accept a bribe. Gratuities are not a crime under this statute." *Id.* Accordingly, the request continued, if the jury found that the trip expenses were paid by Bravo as a gratuity, it could not convict him of violating §666, *Id.* Under the circumstances of this case, the court's refusal to so instruct was prejudicial error requiring the vacatur of Bravo's conviction.

### 1. The requested instruction was correct as a matter of substantive law.

The district court's refusal to give a requested instruction constitutes reversible error "if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." *United States v. Adams*, 740 F.3d 40, 45 (1st Cir. 2014). The requested instruction was correct as a matter of substantive law; indeed, it derived directly from *Fernandez*. 722 F.3d at 19.

### 2. The requested instruction was not substantially incorporated in the charge.

The charge as given left the jury entirely unaware that there was a category of

payments falling between things of value given to "curry favor," "cultivate a friendship," or "express gratitude," which are neither bribes nor gratuities, and quid-pro-quo bribery that do *not* violate §666, *i.e.*, gratuities and agreements to give or receive gratuities. The absence of the requested instruction left a gaping hole in the jury's understanding of both the *mens rea* and *actus reus* of the §666 offense: that an agreement to give/accept a gratuity, even if made before the official acts have been performed, can nonetheless be something other than a bribe and that an intent limited to the giving/receiving of that gratuity is not a corrupt intent within the meaning of §666. The evidence here was consistent with both types of gratuity—both rewards for past actions and rewards for future actions that Martinez and de Castro Font had already determined to take.

The failure to give the requested instruction was especially problematic in light of the instructions that the court did give. The requested instruction was essential to clarify the "reward" instruction, which effectively told it could convict Bravo if he promised the trip to Martinez before Martinez took action and then gave him the trip after Martinez took action, *see* page 29, *supra*, a scenario entirely consistent with the giving of a gratuity/reward. *See, e.g., United States v. Sawyer*, 85 F.3d 713, 730 (1st Cir. 1996)("As the word 'gratuity' implies, the intent most often associated with the offense is the intent to 'reward' an official for an act taken in the past or to be taken

in the future.").[35]

The instructions repeatedly used the statutory phrase "influence or reward," App:3070-77, but never explained to the jury what was necessary to make a reward bribery, as opposed to a gratuity, nor did they ever link the quid-pro-quo instructions to the "influence or reward" instructions. At no point were jurors informed that the word "reward" *only* applies to quid-pro-quo exchanges with the intent to influence. Nor were jurors informed that gifts to thank a public official for any act—past or present—are not "rewards" within the meaning of § 666. Because the jurors were not instructed on the strictly limited definition of "reward" in *Fernandez*, they were left without essential guidance on this critical point.

It is true that the court instructed on the quid-pro-quo requirement a in a separate "Bribery" instruction, telling the jury, among other things, "[i]t is not sufficient that the thing of value is made to curry favor because of the official's position, cultivate a friendship or express gratitude, or that there is some connection in time or place with an official act that is promised to the giver." App:3078. But this identical instruction, given in the 2011 trial, *see Fernandez*, 722 F.3d at 17-18,

---

[35] Other circuits have equated "reward" with "gratuity" and cautioned against using "reward" 'language in an instruction in a bribery case. *See, e.g., Bahel*, 662 F.3d at 636; *United States v. Ganim*, 510 F.3d 134, 150 (2d Cir. 2007); *United States v. Munchak*, 527 Fed. App'x 191, 194 (3d Cir. 2013).

was not sufficient to foreclose the potential that the jury had convicted the defendants on a legally invalid gratuities theory under the language contained in the specific instructions on each of the § 666 counts. *See id.* at 20 ("While the language in Jury Instruction 22 correctly states the requirements for a bribery conviction, it was not sufficient to offset the flatly contrary language in Jury Instructions 20 and 21. This is particularly so because the gratuities theory was offered in the instructions on the § 666 counts themselves, whereas the correct bribery language was in a subsequent global instruction . . . .").

This Court's words ring even truer here because the § 666 element instructions repeated that "the Government need only prove" intent to reward or to be rewarded and that "the government has met its burden" if the jury found intent to reward or to be rewarded. *See* pages 29-30, *supra*. The "Bribery" quid-pro-quo instructions said nothing about "rewards," and thus nothing that would correct jurors' natural (but erroneous) understanding that "reward" as used in the § 666 instructions would include  rewards for past or future action in the lawful gratuity sense.

The requested instruction was also essential to supplement the court's bribery instructions, which told the jury:

> A bribe can be promised before but paid after the public official's actions on the payor's behalf. On other words, the payment of a bribe can occur after the public official completes the act that is the subject of the bribe so long as the

agreement to pay the bribe or the act is made before the act takes place.

App:3079. The jury was not told, however, that there was a type of agreement to give/receive a thing of value before official acts are performed that is *not* bribery: a an agreement to give/receive a gratuity to reward an official for an act to be taken in the future that the official may have already determined to take. Finally, the instruction was necessary to clarify that such an agreement was not a "corrupt" agreement under §666.

**3. The requested instruction was integral to an important point in the case.**

The requested instruction was critical to the centrally contested issue in the case: whether the agreement was one to pay a quid-pro-quo bribe or instead a gratuity. The evidence more than amply supported the proposition that the Las Vegas trip expenses were gratuities and that Bravo agreed to pay them and Martinez and de Castro-Font agreed to accept them as a gratuity/reward for past or future acts. The evidence that Martinez had supported both 410 and 471 from the time they first entered his office in February, that that support never wavered, and that it would be extraordinarily unusual for a legislator to withdraw his support for legislation that he himself had proposed was overwhelming. Thus, the evidence neatly fit the gratuity paradigm—a reward either for past acts or for future actions that Martinez and de

Castro-Font were already committed to take—and a properly instructed jury would likely have so found. Absent the "explicit explanation" that the defendants requested, the charge was "slanted in favor of conviction." *Sawyer*, 85 F.3d at 741.[36]

### C. Failure to Instruct the Jury that It Was Required to Find that Martinez and de Castro Font Changed Their Positions on 410 and/or 471.

The distinction between a bribe given to influence future acts and a gratuity/reward given because of anticipated future acts is far from precise. In a case such as this one, where substantial evidence supported the defendants' reward/gratuity defense and where the government's bribery theory rested predominantly on the timing of the trip in relation to official acts taken by Martinez and de Castro-Font and the purported luxuriousness of the accommodations, and

---

[36] Unlike *United States v. McDonough*, 727 F.3d 143 (1st Cir. 2013), the requested instruction was not, for the reasons addressed above, "substantially covered in the charge actually given." *Id.* at 157. In asking for the requested instruction, defendants were not asking the court "to provide an exhaustive list of conduct that would not be illegal." *Id.* Quite the contrary, they were seeking a carefully targeted instruction essential to the jury's ability to evaluate their defenses, especially in light of the other shortcomings in the charge. Section 666 bribery has a component that neither honest services fraud nor extortion under color of official right (the offenses charged in *McDonough*) has, *i.e.*, the "reward" element that required clarification here. *See United States v. Hawkins*, 777 F.3d 880, 884 (7th Cir. 2015)(error to instruct jury that honest services fraud bribery could be found if there was an intent to be influenced *or rewarded* because reward is solely a creature of §666).

where the evidence undisputably showed that Martinez supported 410 and 471 from the very outset, well before there was any talk of a trip to Las Vegas, the jury requires careful guidance as to how to draw this outcome-determinative distinction.

How, then, under such circumstances, is the jury to separate the quid-pro-quo agreement from the agreement to give a gratuity for future acts when there is no direct evidence of a quid-pro-quo agreement and the same evidentiary foundation could support either? How, when the same factual scenario could support either, is the jury to distinguish between reward/bribery and reward/gratuity and determine whether the agreement was a "corrupt" one within the meaning of §666? One obvious way is to look at what happened after the agreement was made (and what that says about the defendant's likely intent). This focus is particularly important because a gratuity may be given for a future act that the legislator has already determined to take.

To assist the jury in making this critical determination, defendants requested that the jury be instructed that the government was required to prove that Bravo intended the payments to cause Martinez and de Castro Font "to change an official position that they would otherwise have taken or to take official action that they would not otherwise have taken but for the payments." App:170.[37] The requested

---

[37] Defendants objected to the failure to give the requested instruction. App:3095.

instruction derived directly from this Court's statement in *Sawyer*, later repeated in *Woodward*, that bribery can be found only where "there is an intent to cause the recipient to alter her official acts." *Sawyer*, 85 F.3d at 741, *quoted in United States v. Woodward*, 149 F.3d 46, 55 (1st Cir. 1998). *See, e.g., United States v. Urciuoli*, 613 F.3d 11, 15 (1st Cir. 2010)(quoting with approval a jury instruction, in an honest services fraud case, that "the Government must prove beyond a reasonable doubt that [defendant] intended the payment to cause [legislator] to alter his official acts, to change an official position that he would otherwise have taken or to take official actions that he would not have taken but for the payment."); *United States v. Tavares*, 844 F.3d 46, 55-56 (1st Cir. 2016)(reversing racketeering predicates based on the state gratuity statute because the government failed to prove "adequate linkage between the thing of 'substantial value' conferred by [defendant] and an 'official act' performed or to be performed," there being no evidence that the legislator "change[d]" his "voting pattern.").

The Court did, to be sure, hold in *United States v. McDonough*, 727 F.3d 143, 159-60 (1st Cir. 2013), that the court had not erred in declining to give the instruction requested here, noting that *Sawyer* did not "equate 'alter' with 'doing something the official would not have otherwise done.'" *Id.* at 160. There was, the Court said, "no meaningful difference between an intent to 'alter' and an intent to 'influence' official

acts." *Id.* at 160 n.10. *McDonough* was not, however, a §666 case but rather an honest services fraud/Hobbs Act extortion case, and the differences between the statutes under which the prosecutions were brought demands a different analysis. *See United States v. Ganim*, 510 F.3d 134, 148 n.7 (2d Cir. 2007)(suggesting the possibility that the standard for proving a quid pro quo under §666 may not be the same as under §201).

Section 666 can be violated in two different ways: by corruptly giving a thing of value to "influence" official acts—the terminology of §201 bribery and honest services fraud—or by corruptly giving a thing of value to "reward" official acts. It is this additional "reward" concept which requires a different approach in a case in which the evidence is consistent with both bribery/reward and gratuity/reward, and the type of agreement between citizen and legislator may be dispositive of the case. Even if "alter" can be seen as synonymous with "influence," the same is not true where "reward" is concerned, for a reward/gratuity is given without an intent to alter or influence. Where the defendant is charged with seeking to influence *or* reward, some limiting principle is essential to assure that the defendant is not convicted of violating §666 through the giving of a reward/gratuity.

Courts have in related contexts recognized the necessity of limiting principles to cabin the reach of statutes that could otherwise prove over-expansive. In

*McCormick v. United States*, 500 U.S. 257 (1991), for example, the Court held that, to avoid criminalizing "the everyday businesses of a legislator" who has received campaign contributions, the government, to convict a defendant of extortion under color of official right, would be required to prove an explicit quid pro quo. *Id.* at 272-73. In *Sun-Diamond*, to prevent §201 from reaching things of value given for general good-will purposes based on the official's position, the Court ruled that, to prove a gratuity offense, the government was required to prove an intent to influence/to be influenced with respect to a specific official act. *Id.* at 405-10. Most recently, in *McDonnell*, the Court rejected the government's expansive view of "official act" in §201 because "[t]he basic compact underlying representative government assumes that public officials will hear from their constituents and act appropriately on their concerns." 136 S.Ct. at 2372.

Similar considerations apply under the circumstances presented here, where Bravo, as every citizen is constitutionally entitled to do and as is commonplace in Puerto Rico, presented then-Senator Martinez with legislative proposals which Martinez enthusiastically embraced from the outset, and only after the approval process was well under way, took Martinez and de Castro Font along on a some-expenses-paid trip to see a celebrated prize fight. There being no direct evidence of a quid pro quo and no evidence that either Martinez or de Castro Font did other than

51

what they would have done without the trip to Las Vegas, the only way to separate reward/bribery from reward/gratuity is to require that the government prove an intent to cause Martinez or de Castro-Font to "change an official position that they would otherwise have taken or to take official action that they would not otherwise have taken but for the payments," that is, that Bravo acted "corruptly" within the meaning of §666.

The instructions given did not adequately convey the critical distinction between reward/bribery and reward/gratuity. The Court's definitions of "reward" and "corruptly" were wholly disassociated from the court's later quid-pro-quo instructions; the court never, in instructing on quid-quo-bribery, after ostensibly having given complete instructions regarding the elements of the §666 offense, referred the jury back to the earlier instructions regarding "reward" and "corruptly" or linked the quid-pro-quo requirement with either term. Instead of providing the jury with this definitive means of distinguishing between reward/bribery and reward/gratuity, the court flatly instructed the jury that the government did *not* have to prove that the agreement regarding the Las Vegas trip "caused Defendant Martinez to change his actions or course of conduct regarding" 410 and 471. App:3073. In this respect also, the charge as given was "slanted in favor of conviction." *Sawyer*, 85 F.3d at 741.

**D. Erroneous Instructions That the Jury Was Not to Consider the Merits of Senate Projects 410 and 471 for Any Purpose.**

In support of their good faith defenses, defendants presented extensive evidence regarding how and why 410 and 471 were beneficial for the citizens of Puerto Rico, yet the district court instructed the jury to disregard that evidence in its entirety: "You are instructed *not* to consider whether Senate Projects 410 and 471 were good or bad laws when reaching a verdict." App:3074 (emphasis added). *See* App:3080-81 ("the Defendants' guilt or innocence does not depend on whether Senate Projects 410 or 471 were good or bad laws.").[38]

Bravo requested that the jury also be told that if he "intended to persuade" Martinez and de Castro Font "to support the legislation because it was desirable or beneficial to the citizens of Puerto Rico and not by offering any bribe, then he would have a complete defense to the crime of bribery." App:169.[39] The failure to give the requested instruction stripped Bravo of a vital component of his good faith

---

[38] Based on the instructions given, the government argued to the jury that it could not consider the merits of the legislation in reaching its verdict and that it was entirely irrelevant whether there were valid reasons to support the two pieces of legislation. *See* App:2871-72, 3023-24.

[39] Bravo objected to the failure to give this instruction. App:3096. This Court "review[s] a claim of erroneous failure to instruct a criminal jury on a proffered theory of defense *de novo*." *United States v. Shinderman*, 515 F.3d 5, 13 (1st Cir. 2008)

defense—that he had not acted corruptly but instead had advocated Senate Projects 410 and 471 because he believed that the legislation was beneficial for the citizens of Puerto Rico.

Whether Bravo was motivated to advocate the passage of 410 and 471 and to petition legislators in a position to advance the legislation because he believed that they were good laws was directly relevant to the question of whether he acted in good faith and without corrupt intent. In telling the jury that it could not take such evidence into consideration in reaching its verdict, the instructions were highly prejudicial error which fatally compromised Bravo's good faith defense. The requested instructions "concerned a sufficiently important point that the failure to give them seriously impaired [defendants'] ability to present [their] . . . defense." *United States v. Prigmore*, 243 F.3d 1, 17 (1st Cir. 2001). *See, e.g., United States v. De La Cruz*, 514 F.3d 121, 139 (1st Cir. 2008). "A criminal defendant is entitled to an instruction on his theory of defense so long as the theory is a valid one and there is evidence in the record to support it." *United States v. Gamache*, 156 F.3d 1, 9 (1st Cir. 1998).

It is, to be sure, no defense to a charge of bribery that the object which the defendant sought to achieve was a good one. The instructions, however, swept too broadly by telling the jury that it could not consider the merits of the legislation *for any purpose*, which would include evaluating the *mens rea* of the defendants and in

making is determination whether the trip was a bribe or instead, at most, a gratuity. The prejudice to Bravo from this erroneous instruction was immense. The centerpiece of Bravo's defense was his contention that he did not act with corrupt intent but instead was motivated to support the bills because he believed that they were beneficial for the security industry and for the citizens of Puerto Rico. The instruction created a profound imbalance: the government could argue, as it repeatedly did, that Bravo was motivated by greed to bribe Martinez and de Castro Font because the legislation could mean substantially increased revenues for Ranger American, but the jury was told that it could not consider, as evidence of his good faith and lack of corrupt intent, that Bravo was instead motivated by the merits of the legislation. The district court's instructions stripped Bravo of a valid and vital avenue of defense.

## III. THE COURT ERRED IN EXCLUDING IMPORTANT DEFENSE TESTIMONY.[41]

The government's theory of the case made the meaning of 471's licensing requirement for the "main executive officer" of a security agency a matter of considerable importance—and considerable dispute.[42] The government sought to

---

[41] This Court's review is for abuse of discretion. *See, e.g., United States v. Page*, 521 F.3d 101, 105 (1st Cir. 2008).

[42] This dispute also played a pivotal role at sentencing. *See* Section IV, *infra.*

portray Bravo as a "greedy" businessman willing to commit bribery to put his competition out of business through the passage of 471. *See* App:563-65, 575-76, 2840-42, 2286, 2868, 2874. The defense, for its part, urged a more natural reading of 471, one in which, if the applicant was a Puerto Rico corporation, then the person required to be licensed was the head of that corporation, not some far-flung parent corporation. The government elicited testimony from Nestor Medina, the head of Loomis Puerto Rico, that he, Loomis and Brinks believed that 471 would require the head of the foreign parent company to be licensed, a requirement with which they would be unable to comply, App:1670-73, 1718-19.

Thereafter, the government objected vehemently to every effort by the defense to elicit additional evidence supporting the defense interpretation of 471. It moved to preclude testimony on this point by Severo Colberg, the author of the predecessor bill on which 471 was modeled, on the ground that it was irrelevant. App:292. The defense countered that Colberg's testimony was relevant because "the government's case regarding . . . 471 is based on the false premise that . . . 471 introduced language defining 'Main Executive Officer' that represented Mr. Bravo's efforts to eliminate his competition in the armored car business by requiring the CEOs of the foreign parent companies of his competitors Loomis and Brinks to hold a local Puerto Rico Private Detective license." App:303-04. Despite the fact that Colberg was the author

of the bill that was the direct predecessor of 471 and from which similar language was incorporated by Velazquez into 471, the court refused to permit Colberg to give his opinion regarding the meaning of 4756's licensing requirement, indicating that it saw a distinction between Medina's opining regarding the meaning of "Main Executive Officer" and a legislator doing so, although failing to explain what that distinction was and why it made a difference in terms of admissibility. App:2329-30.

The issue arose again during the testimony of Jose Velazquez, the legislative aide who drafted 471, when the government vigorously opposed Velazquez's opining regarding the meaning of the licensing provision. App:2458-70. Ultimately, the court permitted but a single question on the issue. App:2469-70. After counsel asked Velazquez whether, in his opinion, 471 would require the CEO of the foreign company or instead the CEO of the Puerto Rico affiliate corporation to hold a private detective's license and received the ambiguous answer the language applied to both, the court sustained the government's objections to counsel's follow-up questions seeking to clarify Velazquez's answer. App:2481-82.

Velazquez and Colberg would have testified that under 471 and its predecessor 4756, the executive who was required to be licensed was the head of the corporation that applied for the license to operate a securities business; if it were a Puerto Rico corporation that applied (as both the Loomis and Brinks operations in Puerto Rico

were), then it was the head of the Puerto Rico corporation who was required to be licensed. App:303-04, 2460. That testimony was relevant and admissible as lay opinion testimony under Fed. R. Evid. 701, and Colberg's testimony was not rendered irrelevant by the fact that that the bill regarding which he would have testified was not 471 but instead its direct predecessor. Relevant evidence is "evidence having *any* tendency to make the existence of any fact that is of consequence" more or less probable. Fed. R. Evid. 401 (emphasis added). This standard is "quite expansive" and creates a "not-too-difficult-to-meet standard." *Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72, 76 (1st Cir. 2010). To be relevant, "the evidence need not definitively resolve a key issue in the case—it need only move the inquiry forward to some degree." *Id.* (citations omitted).

Velazquez's testimony more than amply fulfills this requirement. He was, after all, the author of the very provision the meaning of which was disputed between the parties and would know better than anyone—certainly better than Medina—what the provision required in terms of its licensing requirements. Colberg's testimony was also relevant, as he was the author of the bill which was the direct predecessor of 471, which had a definition of "Chief Executive Officer" that was very similar to 471's definition of "Main Executive Officer," as well as similar licensing requirements, and Velazquez testified that he consulted Colberg's bill in drafting 471. The testimony of

58

both Velazquez and Colberg regarding the meaning and effect of 471 and 4756, on which 471 was based, was relevant to the proper interpretation of 471, which, under the government's theory of the case—that Bravo was motivated to commit bribery by the chance to put competitors out of business and thereby gain increased revenues for his own company—was of consequence in determining the action.

Lay witness opinion is admissible if it is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The rule "is meant to admit testimony based on the lay expertise a witness personally acquires through experience." *United States v. Vega*, 813 F.3d 386, 394 (1st Cir. 2016). That experiential expertise "refers to those processes that are well founded on personal knowledge and susceptible to cross-examination." *United States v. Ayala-Pizarro*, 407 F.3d 25, 28 (1st Cir. 2005). The testimony of both Velazquez and Colberg satisfies this standard. It would have been based on their personal knowledge, gleaned from their legislative experience in considering and drafting 471 and 4756 in particular and proposed legislation in general, and it certainly would have been helpful to the jury in determining whether the Puerto Rico Senate had, as the government contended, virtually unanimously passed legislation that would have put

two substantial Puerto Rico corporations out of business or whether, instead, as the defense contended, 471 aimed only at insuring that the main executive officer *of the corporation that applied for a license* held a private detective's license, a facet of the existing law that Loomis and Brinks were unlawfully flouting.

The error in excluding the testimony was not harmless. It was the government that inserted this issue into the case and made it a central part of its theory of Bravo's motivation to commit bribery, and the excluded testimony was central to the defense's ability to rebut the government's theory.

## IV. THE DISTRICT COURT ERRED IN CALCULATING BRAVO'S GUIDELINES OFFENSE LEVEL.[41]

The district court imposed a 14-level adjustment under USSG §2C1.1(b)(2) based on its finding that the "benefit . . . to be received" as the result of the bribes was $662,707, its estimate of the additional profits that Ranger American would have made in 2005, because, it believed, had 471 been enacted into law, Loomis would have been forced to close, and its armored car business would have gone to Ranger American. Add:43-44. Because the basis for this finding was speculative and rested on too many unduly attenuated assumptions, the addition of 14-levels to Bravo's

---

[41] This Court reviews the district court's legal interpretation and application of the Guidelines de novo and reviews loss or benefits calculations for "clear error." *United States v. Vazquez-Botet*, 532 F.3d 37, 65 (1st Cir. 2008)

offense level was error. There was no reasonable basis on which to calculate the "benefit . . . to be obtained," and the §2C1.1(b) (2) adjustment should, therefore, have been based on the amount of the bribe, $5,382.79. *See* SApp:47. Accordingly, there should have been no §2C1.1(b)(2) adjustment, as that amount does not exceed $6,500.00. Bravo's total offense level should, therefore, be 18, and not 32, as calculated by the district court. Because Bravo's 48-month sentence exceeds the guidelines sentencing range ("GSR") of 27-33 months applicable to level 18, this matter should be remanded for resentencing.

## A.    Background.

The PSR concluded that the value of the benefit could not be reliably determined,[42] but found that the value of the bribe was more than $6,500 but less than $15,000 because it assumed, without supporting evidence, that Bravo, in hosting Martinez and de Castro Font, "incurred other expenses that were not identified during trial, but which are certainly customary of leisure trips." SApp:46-47. The total offense level was, therefore, according to the PSR, 20, corresponding to a 33-41

---

[42] The PSR found Medina's testimony to be unduly speculative. SApp:46, 101-02. It further found, based on expert reports presented by Bravo, that, even were Medina's testimony a sufficiently reliable basis for a conclusion that Loomis would have gone out of business, it was not possible to reliably ascertain the degree to which Ranger American would have benefitted from Loomis' demise. SApp:46-47, 102-04.

month GSR. In response to the government's objection that the value to be obtained was $1.5 million, the amount that Medina said was Loomis' profit from its armored car business, the PSR Addendum explained why Medina's testimony was too speculative to support a finding that Loomis would have gone out of business and that Ranger American would have garnered the entirety of its armored car business. SApp:100-05.

At sentencing, Bravo contended that the adjustment should be based on the value of the bribe, as the value of the benefit was unduly speculative, and there was no evidence that Bravo's intent was to drive other armored car companies out of business. App:3443-47, 3454. The court and the government focused on Medina's testimony in which he opined that 471 would put Loomis out of business and Velazquez's ambiguous testimony that "main executive officer" applied to both the head of the Puerto Rico corporation and the head of the parent company. App:3449, 3456-57, 3460-61, 3468-69. The court also found it significant that 471 changed "senior executive officer" in 108 to "main executive officer," apparently believing that 108 sufficed to ensure that security companies complied with the law, despite the absence of a definition of "senior executive officer." App:3471-73.

The court found that the benefit was "reasonably estimated" at more than $500,000 and less than $1,500,000. Add:29. As support for its conclusion, the court

found that (1) a reasonable interpretation of 471 "is that the main executive officer is the highest rank employee within a corporation;" (2) Ranger American's highest ranked employee resided in Puerto Rico but the highest ranking employees of Loomis and Brinks did not; (3) Rivera "understood that if the main executive officer wasn't from Puerto Rico, he could not operate;" (4) Portilla testified that in 2005, the main executive officers for Loomis and Brinks lacked private detective licenses;[43] (5) Portilla testified that 108 "permitted Loomis and Brinks to operate in Puerto Rico regardless of the parent corporations' location;" (6) Velazquez testified that 471's licensing requirement applied to both the Puerto Rico corporation and the "main company;" (7) it was Bravo's intent "to capitalize on the advantage he possessed over his competitors" in being licensed in Puerto Rico and fulfilling other requirements of 471; (8) Medina testified that Loomis earned $1.5 million net profit from its armored car business in 2005 and that, had Loomis and Brinks exited the armored car market, that business would have gone to Ranger American. Add:33-34.

The court concluded, based on this evidence, that the "main executive officer" under 471 was "the highest ranked employee within the company, not simply within

---

[43] Portilla's testimony referred to the heads of the Puerto Rico corporations. Both Loomis and Brinks were flouting 108, as the heads of their Puerto Rico corporations were not licensed. 108 did not in fact permit Loomis and Brinks to operate in Puerto Rico in 2005, as their senior executive officers did not hold private detective licenses.

Puerto Rico" and that Loomis and Brinks could not comply with that requirement because it was unlikely that the heads of Loomis' and Brinks' parent companies would relocate to Puerto Rico and become licensed. Add:36-37.

The court found that Bravo's offense level was 32, corresponding to a 108-120 GSR. App:3458. Based on Bravo's significant health problems, his many substantial contributions to the community, his substantial contributions during Puerto Rico's recovery from recent hurricanes, and his efforts in helping inmates remain connected to their families, the court sentenced Bravo to 48 months.

## B.    Medina's Testimony Was Not a Reliable Basis for the Imposition of a 14-level Adjustment.

The government "bears the burden of supporting its loss calculation with reliable and specific evidence." *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006). It has not done so here. Instead, the postulation that Loomis would have been forced out of business by the passage of 471 does not rise above the level of speculation, an impermissible basis for an enhancement of the guidelines offense level. While the guidelines require only that district courts make a reasonable estimate of loss, courts "must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997). *See, e.g., United States v. Deutsch*, 987 F.2d 878, 886

(2d Cir. 1993)("speculation is not permissible under the guidelines"). That 471 would have put Loomis out of business in 2005 is an unduly speculative basis for the court's 14-level adjustment. Bravo's due process right to "be sentenced on the basis of reliable and accurate information," *United States v. Kenney*, 756 F.3d 36, 49 (1st Cir. 2014), was violated here.

To reiterate, 471 defined "main executive officer" as "that officer of highest rank, in management, administration and operations, of the security agency and/or corporation, as appointed." App:3350. Under 471, a license to operate a private security agency could be granted "[w]hen so requested by a corporation organized in the United States and authorized to do business in Puerto Rico, or when the corporation is organized in the Commonwealth of Puerto Rico, according to its incorporation certificate, . . . so long as *its* Main Executive Officer is a Private Detective with a license . . . ." *Id.* (emphasis added). The most natural reading of the operative language is that the person required to be licensed is the "main executive officer" of the corporation that requests the license; if the corporation requesting the license is a Puerto Rico corporation, then it would be the "main executive officer" of that corporation who was required to be licensed. Medina was the "main executive officer" of Loomis, a Puerto Rico corporation, and it is he, as under 108, who would have been required to be licensed.

In reaching its conclusion that 471 would have required the head of Loomis' parent company in Texas, or even perhaps in Sweden, to be licensed in order for Loomis to operate in Puerto Rico, the court relied predominantly on Medina's opinion that that was what the language of 471 meant. Medina was, however, entirely unqualified to opine on the meaning and effect of 471. While he may have had personal knowledge of Loomis' operations, he had no personal knowledge of what the language of 471 meant or was intended to mean.[44] Medina's testimony was entirely too unreliable a basis for a conclusion that 471 would have required the head of Loomis' parent company to be licensed. Moreover, the court ignored Portilla's testimony that he understood 471 to refer to head of the Puerto Rico company. App:1636. Portilla's understanding was no less valid than Medina's.

The court also relied on Velazquez's testimony that the language of 471 referred to both the head of the Puerto Rico corporation and the head of the foreign parent company, but this testimony too was insufficiently reliable, as the court refused to permit the defense to clarify Velazquez's answer to the single question on the subject that the court permitted the defense to ask. *See* page 47, *supra.* The

---

[44] The requirements for the admission of lay opinion testimony have been discussed at page 49, *supra. See, e.g., United States v. Vazquez-Rivera*, 665 F.3d 351, 358 (1st Cir. 2011)(testimony improperly admitted because not based on personal knowledge).

defense told the court that Velazquez would testify that the language meant that, if the requesting corporation were a Puerto Rico corporation, it was the head of the Puerto Rico corporation that was required to be licensed. App:2460. Velazquez's "both" answer was, at best, ambiguous, and an interpretation of his testimony to mean that the head of both the foreign parent and the Puerto Rico subsidiary would be required to be licensed is inconsistent with the singular "its" in the language quoted above, which refers to the United States corporation *or* the Puerto Rico corporation, not to both at the same time. Velazquez's testimony was too ambiguous to support a finding that 471 would have required the head of the foreign corporation to be licensed when the applicant for the license was the Puerto Rico subsidiary corporation. Nor does Rivera's testimony on which the court relied support the proposition that 471 would have required the head of the foreign parent to be licensed. What Rivera actually testified was that 471 defined "main executive officer" and required that that person reside in Puerto Rico and that a corporation that could not meet these requirements could not operate in Puerto Rico. App:1156-57. His testimony says nothing about the meaning of "main executive officer" or whether it applied to the foreign parent if the applicant was a Puerto Rico corporation.

The court also laid substantial stress on the change of "senior executive officer" in 108 to "main executive officer" in 471, opining, based on a 2008 Puerto

Rico appellate court decision construing the term, that had the change not been made, Loomis could have continued to operate in Puerto Rico, and that had "they" kept 108's "senior executive officer" terminology and had "they" not changed it to "main," "we may not have this situation." App:3446-48; Add:35-36. "They," however, could not have known that the appellate court would, years later, supply the definition of "senior executive officer" that 108 lacked and that "they" were seeking to supply in 471. Moreover, the "they" in question were first Colberg, who produced 471's predecessor, and then Velazquez who consulted 4756 in drafting 471 and adopted virtually identical language.

Nothing in the change of language and definition supports the proposition that 471 was intended to put Loomis out of business or that the Puerto Rico legislature would pass a bill that would put two large Puerto Rico corporations out of business. As one court has stated, in distinguishing a prior case in which the court had concrete data in the form of the net profit from the illegally obtained contract, "[i]n contrast, calculating the total benefit received by companies who profit from improperly passed legislation is a far less certain endeavor, one that . . . is potentially limitless in reach." *United States v. Ellis*, 951 F.2d 580, 586 (5th Cir. 1991).

**C.    The Court's Conclusion That Loomis Would Have Immediately Gone out of Business upon the Passage of 471 Was Speculative and Unfounded.**

The second fallacy on which the court's loss calculation rests is that Loomis would have immediately gone out of business in 2005 upon the passage of 471. Loomis Puerto Rico was a profitable company, and it is inconceivable that it would simply close up shop when 471 passed. Instead, the considerably more reasonable inference is that it would, as it did when Bravo had earlier challenged its unlawful licensing, have litigated the issue, through the appellate process if necessary, *see* note 6, *supra*, and it is unlikely that the Puerto Rico courts would have interpreted the language of 471 to require that the head of Loomis' parent company be licensed and require Loomis to close.

**D.    There Is No Basis for a Finding That Bravo Reasonably Expected That Ranger Would Obtain All of Loomis' 2005 Armored Car Business.**

The 14-level adjustment cannot be sustained unless Bravo, at the time of the bribe, *reasonably expected* to receive all of Loomis' 2005 armored car business in exchange for the Las Vegas trip. *See, e.g., United States v, Vazquez-Botet*, 532 F.3d 37, 67 (1st Cir. 2008)("Reasonable expectation at the time of the [bribe] is the touchstone of the inquiry."); *United States v. Appolon*, 695 F.3d 44, 67 (1st Cir. 2012)("Intended loss is the loss that the defendant could have reasonably expected

to occur at the time he or she perpetrated the fraud."); *see also United States v. Nelson*, 732 F.3d 504, 521-34 (5th Cir. 2013)(defendant could not have reasonably expected letters of support he wrote to result in award of contracts for the amount determined by the district court).

For the reasons addressed in the previous sections, Bravo cannot be found to have reasonably expected, when he offered the Las Vegas trip, that the result of 471's passage would be that Loomis would be forced out of business in 2005 and that Ranger American would garner *all* of Loomis' 2005 net revenue. There is no evidence that Bravo's intent was to put Loomis out of business or that he reasonably expected that that would be the result of 471's passage. Medina testified that, when Bravo had earlier challenged Loomis' unlawfully-obtained license, Bravo was not trying to put Loomis out of business but instead to ensure compliance with the law, App:1714; Loomis brought itself into compliance and continued to operate without interruption. As Portilla testified, the reasonable expectation was that Loomis would comply with 471, not that they would stop doing business. App:1503-04. Portilla also testified that his and Bravo's intent in pursuing changes to 108 was not to *eliminate* competition but rather to ensure *fair* competition. App:1640-41. The district court ignored this testimony.

The cases on which the district court relied do not support its finding. In *United*

*States v. Muhammad*, 120 F.3d 688 (7th Cir. 1997), a juror in a civil trial offered to sway the jury to return a verdict in favor of the corporate defendant in return for $2,500. The jury returned a plaintiff's verdict in the amount of $933,000. *Id.* at 700. Thus, the district court had "a quantifiable figure for the benefit that Cumberland would have received had Muhammad's scheme worked." *Id.* In *Muhammad*, in sharp contrast to this case, there was direct evidence, in the form of Muhammad's bribe proposition, of the benefit that Muhammad was offering to confer on the corporation—a defendant's verdict, the value of which could be accurately measured by the jury's adverse verdict and that that was his intent in seeking the bribe. Similarly, in *United States v. Falcioni*, 45 F.3d 24 (2d Cir. 1995), the bribe was offered to an IRS officer to eliminate a concrete tax liability amount. *Id.* at 25, 27. There is no comparable evidence in this case, nothing to support the finding that Bravo's intent was to put Loomis out of business and that he reasonably expected that the passage of 471 would produce this result.

"Intended loss" is the pecuniary harm that was *intended* to result from the offense. USSG §2B1.1, App. Note 3(A)(ii). That standard is an objective one: the defendant's "subjective state of mind at the time of his offenses is not what governs. Rather, we must ask whether an objectively reasonable person would have intended for the [offense] to cause loss." *United States v. Stergios*, 659 F.3d 127, 136 (1st Cir.

71

2011). *See United States v. Innarelli*, 524 F.3d 286, 291 (1st Cir. 2008)("Notwithstanding the Guidelines commentary's use of the word "intended," we focus our loss inquiry for purposes of determining a defendant's offense level on the objectively reasonable expectation of a person in his position at the time he perpetrated the fraud, not on his subjective intentions or hopes"). An "objectively reasonable person" would not have expected in 2005 that the passage of 471 would put Loomis out of business. In no sense can the closure of Loomis be regarded as a "natural and probable consequence," *United States v. Alli*, 444 F.3d 34, 38 (1st Cir. 2006), of the passage of 471. The district court's benefit calculation was clearly erroneous.

## CONCLUSION

Because the evidence was insufficient to support Bravo's conviction, his conviction should be reversed. If the Court does not reverse the conviction, the conviction should be vacated. At minimum, the matter should be remanded for resentencing.

Respectfully submitted,
By his attorneys,

**/s/ Kimberly Homan**
Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-8616 (Telephone)
(617) 338-9538 (Fax)
homanlaw@aol.com

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

No. 18-1358

_____

UNITED STATES OF AMERICA,
Appellee

v.

JUAN BRAVO FERNANDEZ,
Appellant

_____

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH
LIMITATIONS**

_____

This brief has been prepared using:

    14 point, proportionally spaced, serif typeface (such as CG Times or Times New Roman). Specify software name and version, typeface name, and point size below:

    Wordperfect Office X8, 14-point Times New Roman

EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; addendum; and the certificate of service, appellant's briefs contain, in total:

    17,998 words, as permitted by Court order of June 8, 2018.

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the word or line printout.

                    **/s/ Kimberly Homan**
                    Kimberly Homan

# CERTIFICATE OF SERVICE

I, Kimberly Homan, hereby certify that on this 11th day of June, 2018, this Brief was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal, and one copy of the Joint Appendix was served, via Federal Express, on Vijay Shanker, U.S. Department of Justice, 950 Pennsylvania Ave., NW, Washington, DC 20530.

**/s/ Kimberly Homan**
Kimberly Homan

# ADDENDUM

# TABLE OF CONTENTS

Judgment (Doc. 1029) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

Opinion and Order (Doc. 999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

District Court Sentencing Findings (Relevant Excerpt) . . . . . . . . . . . . .     29

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Puerto Rico

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| JUAN BRAVO-FERNANDEZ | Case Number:  3:10-cr-00232-1(FAB) |
| | USM Number:  35080-069 |
| | Reid H. Weingarten and William L. Drake |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)   Four (4) on May 31, 2017
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:666(a)(2) and 2 | Bribery concerning programs receiving federal funds. | May, 2005 | Four (4) |
| | | | |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   One (1) (Court of Appeals Opinion and Judgment dated 6/26/2013).

☑ Count(s)   Two (2)   ☑ is   ☐ are  dismissed by order of the Court on 12/12/2011 (Docket No. 588).

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 12, 2018
Date of Imposition of Judgment

s/Francisco A. Besosa
Signature of Judge

Francisco A. Besosa, U.S. District Judge
Name and Title of Judge

April 12,  2018
Date

AO 245B (Rev. 02/18)   Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT:  JUAN BRAVO-FERNANDEZ
CASE NUMBER:  3:10-cr-00232-1(FAB)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

FORTY-EIGHT (48) MONTHS*
*BOP shall apply credit for any time spent in federal custody.

☐  The court makes the following recommendations to the Bureau of Prisons:

☐  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____  ☐ a.m.  ☐ p.m.  on _____ .

    ☐  as notified by the United States Marshal.

☑  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on _____ .

    ☑  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___7___

DEFENDANT:   JUAN BRAVO-FERNANDEZ
CASE NUMBER:   3:10-cr-00232-1(FAB)

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

THREE (3) YEARS

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page _____4_____ of _____7_____

DEFENDANT:  JUAN BRAVO-FERNANDEZ
CASE NUMBER:  3:10-cr-00232-1(FAB)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____      Date  _____

Judgment—Page ___5___ of ___7___

DEFENDANT:  JUAN BRAVO-FERNANDEZ
CASE NUMBER:  3:10-cr-00232-1(FAB)

## SPECIAL CONDITIONS OF SUPERVISION

1.  He shall observe the standard conditions of supervised release recommended by the United States Sentencing Commission and adopted by this Court.

2.  He shall not commit another Federal, state or local crime.

3.  He shall not possess firearms, destructive devices, or other dangerous weapons.

4.  He shall not possess controlled substances unlawfully.

5.  He shall submit himself and his property, house, residence, vehicles, papers and effects, computers and other electronic communication or data storage devices or media to a search, at any time, with or without a warrant, by the probation officer, and if necessary, with the assistance of any other law enforcement officer but only in the lawful discharge of the supervision functions of the probation officer with reasonable suspicion of unlawful conduct or of a violation of a condition of supervised release. Failure to submit to a search and seizure may be grounds for revocation of supervised release. The defendant shall warn any other resident or occupant that the premises may be subject to searches pursuant to this condition.

6.  He shall perform 120 hours of unpaid community service work during the supervision period at a private non-profit or public facility to be selected and under the arrangements that the Probation Officer may determine. Mr. Bravo shall satisfy this condition by selecting, in consultation with the Probation Officer, 3 different non-profit or charitable relief entities per year of supervised release and provide each with 40 hours of advice, guidance and consulting services geared towards creating comprehensive, and customized emergency response plans to minimize the loss of life and property in the event of a natural disaster.

7.  He shall provide the Probation Officer complete access to any financial information upon request, including all business and personal finances.

8.  He shall cooperate in the collection of a DNA sample, as directed by the Probation Officer, pursuant to the Revised DNA Collection Requirements, and Title 18, U.S. Code Section 3563(a)(9).

9. Pursuant to the provisions of 18 U.S.C. § 3563(a)(5), the Court waives the requirement for mandatory drug testing in the absence of any evidence of current drug use and the low risk of future abuse of controlled substances.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
              Sheet 5 — Criminal Monetary Penalties

Judgment — Page   6   of   7

DEFENDANT: JUAN BRAVO-FERNANDEZ
CASE NUMBER: 3:10-cr-00232-1(FAB)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 150,000.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $              0.00 | $              0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B  (Rev. 02/18)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT:  JUAN BRAVO-FERNANDEZ
CASE NUMBER:  3:10-cr-00232-1(FAB)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __150,100.00__  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐  C,   ☐  D,   ☐  E, or   ☐  F below; or

B  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

    If SMA payment was not returned in the previous sentence, it will be credited at this time.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

**Plaintiff,**

**v.**

JUAN BRAVO-FERNANDEZ [1],
HECTOR MARTINEZ-MALDONADO [2],

**Defendants.**

**Criminal No.** 10-232 (FAB)

OPINION AND ORDER

BESOSA, District Judge.

Before the Court is defendant Juan Bravo-Fernandez's ("Bravo") and defendant Hector Martinez-Maldonado's ("Martinez") joint post-trial motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). (Docket No. 971.) For the reasons set forth below, the Rule 29 motion is **DENIED**.

**I.   BACKGROUND**

Because the parties are familiar with the facts of this case, the Court will not repeat them here except where necessary. A general description of the trial proceedings will suffice. See United States v. Stierhoff, 549 F.3d 19, 21 (1st Cir. 2008). The Court conveys the facts throughout this opinion in the light most favorable to the jury's verdict. United States v. Rodriguez-Marrero, 390 F.3d 1, 6 (1st Cir. 2004).

On June 22, 2010, a federal grand jury returned an indictment charging defendants Bravo and Martinez with, among other criminal offenses, federal program bribery in violation of 18 U.S.C. § 666(a)(2) and 18 U.S.C. § 666(a)(1)(B) ("section 666"), respectively. (Docket No. 1.) Following a two-week trial, the jury convicted defendants Bravo and Martinez of violating section 666 on March 7, 2011.[1] See Docket No. 438. The First Circuit Court of Appeals ultimately vacated the convictions of defendants Bravo and Martinez for violating section 666, and remanded the case for further proceedings.[2] United States v. Fernandez, 722 F. 3d 1, 39 (1st Cir. 2013). The First Circuit Court of Appeals held that the Court's 2010 jury instructions were erroneous because they permitted the jury to convict pursuant to a gratuity theory, stating that "[t]he government may not pursue a conviction on that ground [i.e., a gratuity theory] if Defendants are retried." Id. at p. 28. The First Circuit Court of Appeals reasoned that

---

[1] The jury also convicted defendants of conspiracy as charged in count one, and defendant Bravo of interstate travel in aid of racketeering, as charged in count two. See Docket No. 438. The Court granted defendant Bravo's motion for acquittal regarding the travel act conviction set forth in count two. United States v. Bravo-Fernandez, 828 F. Supp. 2d 441, 449 (D.P.R. 2011) (Besosa, J.). The jury acquitted defendant Martinez of the charges alleged in counts three and six of the indictment—interstate travel in aid of racketeering and obstruction of justice, respectively. Id. The First Circuit Court of Appeals reversed defendant Bravo's conspiracy conviction. United States v. Fernandez, 722 F.3d 1, 39 (1st Cir. 2013).

[2] On remand, only the section 666 offenses alleged in counts four and five were at issue.

defendants cannot be convicted pursuant to a gratuity theory because "the true target of § 666 are bribes, not gratuities." Id. at 26.

The government retried defendants Martinez and Bravo for federal program bribery in a second trial that took place between May 2, 2017 and May 31, 2017. In charging the jury, the Court omitted language that would allow a jury to find defendants guilty pursuant to a gratuity theory, and specifically instructed the jury on what the government must prove to establish the existence of a bribery. See United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 405 (1999) (distinguishing a *quid pro quo* bribe from an illegal gratuity); United States v. Mariano, 983 F.2d 1150, 1159 (1st Cir. 1993) ("The essential difference between a bribe and an illegal gratuity is the intention of the bribe giver to effect a *quid pro quo*."). By way of example, the Court instructed the jury that:

> **Bribery requires that the government prove beyond a reasonable doubt the existence of a *quid pro quo***, in plain English, an agreement that the thing of value that is given to the public official is in exchange for that public official promising to perform official acts for the giver. **It is not sufficient that the thing of value is made to curry favor because of the official's position, cultivate a friendship or express gratitude**, or that there is some connection in time or place with an official act that is promised to the giver; rather there must be an agreement that the thing of value was offered by defendant Bravo and accepted by Senator Martinez in exchange for a promise to perform an official act.

10

(Docket No. 960 at p. 30) (emphasis added).  Notably absent from the Rule 29 motion are challenges to the jury instructions during defendants' second trial.  Indeed, defendants revisit the gratuity/bribery dichotomy only with regard to the sufficiency of the evidence, not the jury instructions.

On May 31, 2017, for a second time, a jury found defendant Bravo and defendant Martinez guilty of committing federal program bribery.  (Docket Nos. 963 and 964.)  Defendants move this Court to "enter a judgement of acquittal of [the section 666 offenses] for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  The Rule 29 motion sets forth two principal arguments:  (1) the government generally failed to prove defendants guilty beyond a reasonable doubt because no rational jury could conclude that defendant Martinez and defendant Bravo entered into a *quid pro quo* agreement, and (2) the government failed to establish the jurisdictional elements required by section 666. (Docket No. 971 at p. 2.)  The government opposed defendants' Rule 29 motion, and defendants replied.[3]  (Docket Nos. 978 & 980.)

---

[3] A defendant may move for judgment of acquittal within fourteen days after a guilty verdict or after the discharge of the jury, whichever is later. Fed. R. Crim. P. 29(c)(1).  In this case, the jury reached a verdict on May 31, 2017. (Docket Nos. 963 & 964.)  The Court granted defendants' motion for an extension of time regarding post-trial motions, allowing defendants until July 7, 2017 to submit the Rule 29 motion.  (Docket No. 970.)  Defendants moved for a judgment of acquittal on July 7, 2017.  (Docket No. 971.)  Accordingly, defendants' Rule 29 motion is timely.

## II.   RULE 29 LEGAL STANDARD

A court may set aside the jury's guilty verdict and enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.   See Fed. R. Crim. P. 29. In reviewing a motion for judgment of acquittal, courts must consider the evidence "in the light most favorable to the prosecution" and determine whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt." United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999) (citations omitted).   Rule 29 motions require courts to "take into account all evidence, both direct and circumstantial, and [to] resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict." Valerio, 676 F.3d at 244; accord United States v. Savarese, 686 F.3d 1, 8 (1st Cir. 2012).   In other words, while the sufficiency of the evidence is at the heart of the Rule 29 inquiry, deference to the jury's verdict informs the Court's analysis.

The Court need only satisfy itself that the guilty verdict "finds support in a plausible rendition of the record." See, e.g., United States v. Shaw, 670 F.3d 360, 362 (1st Cir. 2012).   Against this backdrop, the First Circuit Court of Appeals has called the sufficiency of evidence challenge "a tough sell," United States v.

<u>Polanco</u>, 634 F.3d 39, 45 (1st Cir. 2011), observing that defendants seeking acquittal on this basis "face an uphill battle," <u>United States v. Perez-Melendez</u>, 599 F.3d 31, 40 (1st Cir. 2010); <u>accord United States v. Hatch</u>, 434 F.3d 1, 4 (1st Cir. 2006) ("These are daunting hurdles.") (internal quotation marks omitted).

**III. DISCUSSION**

    **A.   Sufficiency of the Evidence**

Defendant Martinez and defendant Bravo argue that the government failed to prove beyond a reasonable doubt that they violated section 666. According to defendants, no rational juror could find that defendant Bravo and defendant Martinez entered into an illicit *quid pro quo* agreement; namely, that defendant Bravo provided a trip to Las Vegas in exchange for influencing defendant Martinez's official acts regarding senate projects 410 and 471.[4] (Docket No. 971 at p. 12.) The Court disagrees.

Defendant Martinez and defendant Bravo attack the sufficiency of the evidence by emphasizing facts adduced at trial that favor the defense. In so doing, defendants overlook evidence supporting the jury's verdict. In ruling on the merits of defendants' Rule 29 motion, the Court must consider "**all the**

---

[4] Senate project 410 concerned a code of conduct for shopping centers. Senate project 471 set forth regulations for the private security industry in Puerto Rico.

**evidence**, direct and circumstantial," in determining whether a judgment of acquittal is warranted.  United States v. Peake, 143 F.Supp. 3d 1, 6 (D.P.R. 2019) (Dominguez, J.) (emphasis added).

Defendants assert broadly that the government failed to prove the following:  when defendant Bravo offered the Las Vegas trip to defendant Martinez, that the defendants were motivated by a corrupt intent, and the existence of a *quid pro quo* agreement between defendant Bravo and Jorge De Castro-Font (De Castro-Font).[5] (Docket No. 971 at pp. 17 and 23.)  Defendants provide specific examples in an attempt to substantiate these assertions.  For instance, defendant Martinez's former adviser, Victor Rivera ("Rivera"), testified that:  (1) defendant Martinez supported senate projects 410 and 471 before the Las Vegas trip, (2) he observed defendant Martinez meet with defendant Bravo and others to discuss the Las Vegas trip, but did not hear defendant Martinez confirm his attendance at the boxing match, and (3) defendant Martinez had no reaction after Rivera recommended that he forego the Las Vegas trip.  Id. at pp. 17 and 18.  Additionally, Carlos Diaz ("Diaz"), De Castro-Font's former assistant, testified that

---

[5] Jorge De Castro-Font is a former senator of the Puerto Rico Legislature.  On October 2, 2008, a grand jury returned an indictment charging De Castro-Font with, *inter alia*, federal program bribery in violation of section 666.  (Case No. 08-337, Docket No. 3.)  De Castro-Font ultimately pled guilty to wire fraud and interference with commerce by threats or violence in violation of 18 U.S.C. sections 1343, 1346 and 1951.  (Case No. 08-337, Docket 174.) The Court sentenced De Castro-Font to 60 months of imprisonment.  (Case No. 08-337, Docket No. 353.)

he received tickets for the flight to Las Vegas on behalf of De Castro-Font from Tato Lebron, not from defendant Bravo personally. Id. at p. 19.

Although defendants cited evidence that tends to undermine the verdict, their rendition of the trial record is incomplete.  By way of example, the government elicited testimony to establish that:  (1) defendant Martinez served as Chairman of the Public Safety Committee, instilling in him the authority to schedule legislative hearings and to determine who testified before the committee, (2) defendants Bravo and Martinez were not friends prior to defendant Martinez's election to the Puerto Rico Legislature, (3) defendant Bravo contributed to various political candidates, but not to defendant Martinez's campaign, (4) defendant Bravo delivered a draft bill of senate project 410 to defendant Martinez near the end of February 2005, (5) on March 2, 2005, defendant Martinez submitted senate project 410 to the Senate for deliberation, (6) also on March 2, 2005, defendant Bravo purchased four $1,000 tickets to the Felix "Tito" Trinidad/Winky Wright boxing match in Las Vegas, (7) defendant Bravo called defendant Martinez and De Castro-Font on March 2, 2005, (8) at a Public Safety Committee hearing on April 12, 2005 regarding senate project 471, defendant Bravo's security firm, Ranger American, was the only private security firm invited to

testify, and (9) that defendant Bravo, defendant Martinez, and De Castro-Font did, in fact, travel to Las Vegas together.  (Docket No. 985 at pp. 17-74; Docket No. 984 at pp. 166-167, 180; Docket No. 987 at pp. 178-180.)[6]

Indeed, the trial record is replete with evidence allowing a reasonable jury to find defendants guilty beyond a reasonable doubt of committing federal program bribery. Defendants' trip to Las Vegas and the legislative actions taken by defendant Martinez and De Castro-Font in furtherance of enacting senate projects 410 and 471 occurred within days of one another, providing the jury with circumstantial evidence that the defendants committed federal program bribery.[7]  See United States v. Agostini, 123 F.3d 1138, 11983 (7th Cir. 1997) ("A reasonable jury could have found that this timing [between officials acts and payment of the bribe] provided circumstantial evidence that Agostini offered Goetz the money with the requisite corrupt intent

---

[6] In the Rule 29 motion defendants Martinez and Bravo "raise and preserve for review the claim that [the] evidence should not be deemed sufficient for purpose of the record."  (Docket No. 971 at p. 45.)  The Court, nonetheless, must consider "the body of proof, as a whole," resolving all evidentiary and credibility questions in favor of the government.  See United States v. Manso-Cepeda, Case No. 14-082, 25 F. Supp. 3d 196, 200 (D.P.R. 2014) (Besosa, J.) (citation omitted).

[7] In Fernandez, the First Circuit Court of Appeals distinguished that section 666 requires an "agreement to exchange [a thing of value] for official action." 722 F.3d at 19.  Circumstantial evidence of a quid pro quo agreement, thus, may be of significant relevance because bribery "agreements [frequently] will be oral and informal," requiring the jury to infer "what the participants say, mean and do."  United States v. McDonough, 727 F.3d, 143, 153 (1st Cir. 2013).

to establish a violation of § 666(a)(2).").  To illustrate, the Public Safety Committee voted on senate projects 410 and 471 on May 12, 2005, the same day defendant Martinez and De Castro-Font voted to transfer this legislation out of committee.  (Docket No. 986 at p. 139.)  The next day, defendant Bravo, defendant Martinez, and de Castro-Font traveled to Las Vegas.  Id.  The day after defendants returned to Puerto Rico, defendant Martinez and De Castro-Font voted to enact senate project 471.  Id.  A week after attending the boxing match, defendant Martinez and De Castro-Font voted in favor of senate project 410.  (Docket No. 985 at p. 70.)  The Court need not itemize every exhibit or piece of evidence presented at trial to conclude that overwhelming evidence supports the verdict.

In addition to presenting an incomplete account of the evidence presented at trial, the Rule 29 motion is fraught with inferences made in the light most favorable to the defense, not the government. The Court will provide two illustrative examples.

First, defendants argue that Rivera's testimony regarding a conversation he had with defendant Martinez undermines the notion that there was a *quid pro quo* agreement between defendants Martinez and Bravo.  (Docket No. 971 at p. 18.)  At trial, Rivera claimed that he suggested to defendant Martinez that he not accompany defendant Bravo to Las Vegas because doing so

17

would be inappropriate.[8]   Id.   According to Rivera, defendant
Martinez had no reaction.   Id.   The government claimed that
defendant Martinez's failure to react was an attempt to avoid
discussing the Las Vegas trip with his mentor.   Id.   Defendants
instead argue that this "is not a reasonable inference," and that
"there is only one logical explanation for [defendant Martinez's]
lack of reaction to his friend and adviser—[defendant Martinez]
had *not* yet been invited to join the trip."   Id.   The Court
disagrees.   The totality of the evidence presented at trial is
consistent with an alternative inference:  that defendant Martinez
avoided discussing the trip with Rivera because he was embarrassed,
choosing to remain silent rather than disappoint a person he
considered to be a father-like figure.

Second, defendants further attempt to undermine the
government's evidence of a *quid pro quo* by arguing that the only
logical inference is that the hotel rooms defendant Bravo reserved
in Las Vegas "were for himself, and not for anyone else." (Docket
No. 971 at p. 20.)  Defendants further argue that "even assuming
it was logical to infer that one of the April 1 reservations was
for someone other than [defendant Bravo], there is no evidence

---

[8] At trial, Rivera testified that he warned defendant Martinez that "it was not
appropriate, that it was not right to be going on a trip with a person who had
two bills submitted before the Committee."  (Docket No. 985 at p. 60.)

18

indicating for whom they were made." Id. Defendants then go on to suggest that the fact that defendants spoke on the phone on March 2, 2005, the date the Las Vegas hotel rooms were reserved, is a "mere coincidence" that "is itself insufficient to establish that [defendant Martinez] was even aware of the trip or the tickets on March 2." (Docket No. 971 at p. 21.)

Defendants cannot prevail on their Rule 29 motion by interpreting isolated facts adduced at trial in a manner that undermines both the verdict and the government's theory of the case. On a Rule 29 motion, courts examine whether "the evidence is insufficient to sustain a conviction," not whether any one particular fact, standing alone, is sufficient to prove a defendant's guilt beyond a reasonable doubt. Fed. R. Crim. P. 29(a). That some of the evidence presented at trial may be subject to an interpretation that is inconsistent with a finding of guilt beyond a reasonable doubt is no reason for the Court to disturb the jury's verdict. This is so because the government need not "[e]liminate every possible theory consistent with the defendant's innocence." United States v. Perez-Melendez, 599 F.3d 31, 40 (1st Cir. 2010) (citation omitted); see also United States v. Abreu, 952 F.2d 1458, 1468 (1st Cir. 1992) ("It is the province of the jury to decide to appropriate weight to give specific evidence.").

Resolving "all evidentiary disputes and credibility questions in favor of the government" and "drawing all reasonable inferences in favor of the government's case," United States v Cedeño-Mariano, 971 F. Supp. 2d 225, 230 (D.P.R. 2013) (Besosa, J.), compels the Court to conclude that there was ample evidence presented at trial to sustain the jury's verdict.  That is, the jury could reasonably infer that defendant Bravo, defendant Martinez, and De Castro-Font traveled to Las Vegas at defendant Bravo's expense.  Similarly, the jury could also reasonably infer that defendants entered into *quid pro quo* agreement on March 2, 2005, the date in which defendants spoke on the phone, and the date defendant Bravo purchased tickets for the boxing match.

**B.   Previous and Contemporaneous Support of Senate Projects 410 and 471**

Defendants Martinez and Bravo move for a judgment of acquittal because "case law establishes that the defendants must intend that the thing of value induce the public official to alter his official act or take an official act he would not otherwise take."  Docket No. 971 at p. 16 (citing United States v. Sawyer, 85 F.3d 713, 730 (1st Cir. 1996) (vacating conviction premised on state law allowing jury to "convict for a gratuity offense," in addition to a bribery offense)).  Defendants argue that "the government must convince the jury that the offer and acceptance occurred before [defendant Martinez] made the decision to support

projects 410 and 471." (Docket No. 971 at p. 22.) Defendants misstate the law.

Section 666 prohibits public officials from accepting things of value "intending to be influenced or rewarded in connection with any business." 18 U.S.C. § 666(a)(1)(B). At trial, the parties disputed whether a *quid pro quo* agreement existed, and if so, when defendants agreed to exchange a trip to Las Vegas for legislative support.

The timing of the agreement is paramount in a prosecution for bribery, particularly with regard to the "rewarded" language in section 666. The First Circuit Court of Appeals explained that "rewarded" in section 666 does not "create a separate gratuity offense." Fernandez, 722 F.3d at 23. Rather, the "rewarded" language simply clarifies that "a bribe can be promised before, but paid after, the official's action on the payor's behalf," also known as a forward-looking bribe. Id. Defendants are correct in stating that "[w]hat matters is not necessarily the timing of the payment, but the timing of the agreement to make or receive the payment." (Docket No. 971 at p. 16, (citing Fernandez, 722 F.3d at 10.)) The government argued, and the jury found, that defendants exchanged a trip to Las Vegas in return for legislative support, and that this exchange influenced defendant Martinez's

official actions.  The government was under no obligation to prove the precise date that the defendants agreed to the bribe.

Defendants, however, seek to impose an additional requirement on the government:  that the conviction cannot stand if defendant Martinez supported senate projects 410 and 471 before entering into a *quid pro quo* agreement with defendant Bravo. Essentially, defendants argue that the government cannot prove bribery in this case because the purported *quo* — defendant Martinez's support for senate projects 410 and 471 — already existed when defendant Bravo offered the *quid* – a trip to Las Vegas.

Precedent and the statutory language defeat defendants' argument.  Absent from section 666 is a requirement that the public official change course, or that the public official adopt legislation that he or she would not otherwise support.  Rather, section 666 forbids public officials from accepting bribes "intending to be influenced," not "intending to deviate from previous plans."  18 U.S.C. § 666(a)(1)(B).  The "intent to be influenced" is the *quo*.

Defendants' argument is further defeated by relevant precedent.  In United States v. Jannotti, the Third Circuit Court of Appeals dismissed the very same argument defendants make in this case.  673 F.2d 578 (3rd Cir. 1982).  Defendants in Jannotti

denied wrongdoing because their actions in furtherance of a
construction project were legitimate and benefited the public.
Id. at 601. The Court rejected this argument, stating that
defendants "fail to negate the permissible inference that both men
knew they were acting improperly in accepting money in return for
their support and influence." Id. It is no defense against
bribery that "had there been no bribe, the (public official) might,
on the available data, lawfully and properly have made the very
recommendation that (the briber) wanted him to make." Id.
(internal quotation marks and citation omitted); id. ("[S]ociety
deals sternly with bribery which would substitute the will of an
interested person for the judgment of a public official as the
controlling factor in official decisions.") (citation omitted).

Similarly, in United States v. Bryant, defendants
asserted that "without a specific allegation that [the public
official] took actions he otherwise could not have taken, the
Indictment does not allege that [the public official] was
influenced by the bargain he struck with [the briber], and despite
the Indictment's use of the word 'exchange,' [the public official]
exchanged nothing." 556 F. Supp. 2d 378, 390 (D.N.J. 2008). The
Bryant court rejected this rational, noting that "exchange" as set
forth in section 666 refers to the exchange of a bribe in return
for influence. Id. A public official, such as defendant Martinez,

23

can "have the intent to be influenced by a bribe, *i.e.*, the intent to make good on the bargain," even though the public official "ends up taking the same action he would likely have taken if he were not bribed." Id. (internal citation omitted); see also United States v. Ford, 435 F.3d 204, 213 (2d Cir. 2006) ("The recipient's 'awareness' that the donor gave something of value for the purpose of influencing the recipient might well constitute strong circumstantial evidence that the recipient acted with the requisite culpable state of mind in accepting the item, but a jury should be clearly instructed that it is the recipient's intent to make good on the bargain, not simply her awareness of the donor's intent that is essential to establishing guilt under [the bribery prong of] Section 666").).

In this case, the jury's guilty verdict is no way undermined by the fact that defendant Martinez may have supported senate projects 410 and 471 because they were "good bills" prior to the Las Vegas trip. (Docket No. 996 at p. 105.) A jury could reasonably find that defendant Martinez supported the legislation for legitimate reasons while simultaneously concluding that he impermissibly intended to be influenced by the trip to Las Vegas. Accordingly, the Court cannot set aside the jury's verdict because

defendant Martinez may have supported senate projects 410 and 471 before the Las Vegas trip.[9]

### C.   Jurisdictional Elements of Section 666

Defendants contest the verdict because, they argue, the government failed to establish that defendant Martinez and De Castro-Font were agents of a Puerto Rico entity that received more than $10,000 in federal funds.  (Docket No. 971 at p. 34.) Section 666 applies to agents of an "organization, government, or agency [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program."  18 U.S.C. § 666(b).  In Fernandez, the First Circuit Court of Appeals held that evidence establishing that "the Commonwealth received over $4.7 billion in federal funds [. . .] was sufficient to show that [defendant Martinez and De Castro Font] are agents of a 'government . . . [that] receives, in any one year period, benefits in excess of

---

[9] In keeping with precedent and the statutory language, the Court instructed the jury that: the thing of value need not have been solicited, demanded, or accepted solely with a corrupt intent to influence or reward because people rarely act for a single purpose.  To find that the thing of value was solicited, demanded, or accepted with a corrupt intent to influence or reward, you must find that defendant Martinez solicited, demanded, accepted, or agreed to accept the think of value in part to corruptly influence or reward his official acts [. . .] **The government is not required to prove that defendant Martinez's solicitation, demand, acceptance, or agreement to accept the trip to Las Vegas caused defendant Martinez to change his actions or course of conduct regarding senate project 410 and/or 471.**"  (Docket No. 960 at pp. 27 & 29) (emphasis added).  Defendants' repeated assertions that "[t]o prove bribery, the government had to prove [defendant Martinez] supported Projects 410 and 471 in exchange for having been offered a bribe—not because he believed the legislation was beneficial for Puerto Rico" are meritless in the context of the Rule 29 motion.

25

$10,000 under a Federal program.'"   722 F.3d at 9 (citing 18 U.S.C. § 666(b)).   At trial, the parties consented to the following stipulation, which the Court read to the jury:

> The parties hereby stipulate that in fiscal year 2005 the Commonwealth of Puerto Rico received more than $10,000 in federal funding.   Specifically, from October 1, 2004, to September 30, 2005, the Commonwealth of Puerto Rico received over $4.7 billion in federal funds.

(Docket No. 932.)   The stipulation read to the jury incorporating language identical to the language reviewed by the Fernandez court satisfies the federal benefits element pursuant to section 666.

Defendant Martinez and defendant Bravo also contend that the evidence presented at trial was insufficient to establish the "business" or "transaction" element of section 666.   (Docket No. 971 at p. 40.)   Pursuant to section 666, bribery must be "in connection with any business, transaction, or series of transactions of such organizations, government or agency involving anything of value of $5,000 or more."   18 U.S.C. §§ 666(a)(1)(B), 666(b).   According to defendants, acquittal is required because senate projects 410 and 471 "did not concern any grants, contracts, money, or property — did not constitute or conduct business or

financial transactions."[10]  Id.  Once more, the Fernandez decision is dispositive.  The First Circuit Court of Appeals specifically rejected this narrow interpretation of the "business or transaction" requirement because doing so "would foreclose large swaths of government activity that, though technically 'non-commercial,' could be profitable for unscrupulous individuals to attempt to influence."  722 F.3d at 14 (citing Salinas v. United States, 522 U.S. 52, 56 (1997)).  Senate projects 410 and 471, including the hearings, votes, research and other official acts associated with this legislation, fulfill the "business or transaction" element pursuant to section 666.

        Defendants' final argument that senate projects 410 and 471 do not satisfy the $5,000 requirement, like the other jurisdictional arguments, is unconvincing.  Section 666 requires that the business or transaction exchanged for the bribe "involve anything of value of $5,000 or more."  18 U.S.C. §§ 666(a)(1)(B), 666(b).  The government presented evidence at trial establishing that senate project 471 would cripple defendant Bravo's competitors in the private security industry, providing defendant

---

[10] Defendants made the same argument in 2010.  See Docket No. 58 at p. 9 (arguing that prosecution pursuant to section 666 is improper because "the Senate passes legislation, it creates law; there is no sort of negotiated financial exchange with any other party.")  This Court rejected defendants' argument, noting that "the Supreme Court, in analyzing a claim under 666, has advised courts to refrain from imposing a 'narrowing construction' of the business or transaction clause."  United States v. Bravo-Fernandez, 828 F. Supp. 2d 441, 454 (D.P.R. 2011) (Besosa, J.).

27

Bravo access to an additional $1.5 million in profits. (Docket No. 989 at p. 19.) This calculation, defendants argue, is too speculative. (Docket No. 971 at p. 45.) Defendants, however, acknowledge that the First Circuit of Appeals addressed this issue in Fernandez, holding that evidence presented in a section 666 prosecution is "sufficient if the direct and foreseeable effect of that legislation would be to give the individual offering the bribe a particular result." 722 F.3d at 15. The government "presented evidence that the foreseeable effect of Senate Project 471 would be a change in the armored car service industry, which in turn would result in financial benefits to Ranger American and [defendant Bravo] far exceeding $5,000." Id. Consequently, the evidence presented at trial is sufficient for a jury to find that senate projects 410 and 471 met the $5,000 threshold set forth in section 666.

**IV.  CONCLUSION**

Based on the foregoing analysis, the Court **DENIES** the Rule 29 motion for judgment of acquittal. (Docket No. 971.)

**IT IS SO ORDERED**.

San Juan, Puerto Rico, September 1, 2017.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE

28

1          The case of *United States v. Arshad* holds that

2     "different payments intended to elicit different actions may

3     warrant treating the payments as multiple bribes."

4          Mr. Bravo relies on the case *United States v.*

5     *Richard* for the proposition that a two level enhancement

6     pursuant to sentencing guideline section 2C1.1(b)(1) is

7     unwarranted and is misguided -- the reliance is misguided.

8          The Court in *Richard* did not address the

9     applicability of section 2C1.1(b)(1), but rather, the

10    propriety of increasing the defendant's offense level based

11    on the amount of the bribe pursuant to sentencing guideline

12    section 2C1.1(b)(2).

13         *Richard* is also distinguishable because in that

14    case, two public officials approached one person to solicit a

15    bribe.  Mr. Bravo, however, approached two Senators in a

16    series of instances occurring over several months and, in

17    fact, bribed each of them.

18         A 14 level increase in the base offense level is

19    warranted pursuant to sentencing guideline section

20    2C1.1(b)(2) and 2B1.1(b)(1)(H) because the value of the

21    illicit benefit to be received by Mr. Bravo, passage of

22    Senate Projects 410 and 471 in return for the payment, the

23    Las Vegas trip, is reasonably estimated to be more than

24    $550,000 but less than $1,000,500.

25         The Government bears the burden of establishing the

1    value of the intended benefit with reliable and specific

2    evidence.

3         The Court, however, need not determine the value of

4    the benefit with precision.

5         Both parties cite *United States v. Vazquez-Botet*, a

6    case in which the First Circuit Court of Appeals held that a

7    reasonable estimate is all that is required regarding the

8    calculation of the benefit to be received.  Courts may

9    consider the intended benefits, not just the actual benefits

10   received.

11        Sentencing guideline section 2C1.1 instructs the

12   Court to incorporate the greatest of the following values:

13   The value of the payment, the benefit to be received or to be

14   received in return for the payment, the value of anything

15   obtained or to be obtained by a public official or others

16   acting with a public official, or the loss to the Government.

17        If the value of the benefit cannot be determined,

18   the value of the bribe is the more appropriate variable.

19        According to sentencing guideline section 2C1.1,

20   however, "It is likely that the payer of such a bribe

21   expected something in return that would be worth more than

22   the value of the bribe."

23        Additionally, the commentary to guideline section

24   2C1.1 provides that the sentence imposed on Mr. Bravo must

25   "be commensurate with the gain to the payer or the recipient

1    of the bribe, whichever is greater."

2          Mr. Bravo argues that the value of Senate Projects

3    410 and 471 cannot be quantified.

4          The pre-sentence investigation report adopts this

5    position stating that the benefit to be received in this case

6    cannot be reasonably calculated.

7          Instead, Mr. Bravo requests that the Court rely on

8    the value of the Las Vegas trip, the bribe, rather than the

9    intended benefit of Senate Projects 410 and 471.

10         The gravamen of Mr. Bravo's loss benefit argument

11   is that no evidence admitted as trial established that Senate

12   Project 471 would eliminate Mr. Bravo's competition in the

13   armored truck business, Loomis and Brinks.

14         The evidence, however, demonstrated that only three

15   companies provided armored car services in Puerto Rico during

16   the relevant time:  Ranger American, Loomis and Brinks.

17         Ranger American was based in Puerto Rico with

18   Mr. Bravo at the helm of the company.  Loomis and Brinks were

19   not headquartered in Puerto Rico.

20         Senate Project 471, the legislation promoted by

21   Mr. Bravo and advanced in the Public Safety Committee by

22   Mr. Martinez, was to replace Law 108.

23         First enacted in 1965, Law 108 set forth the

24   requirements to obtain a private detective license in

25   Puerto Rico.

1    Law 108 required, among other things, that private

2 detectives be a citizen of the United States and of the

3 Commonwealth of Puerto Rico, pass a written examination

4 administered by the Superintendent of the Puerto Rico Police

5 Department, and complete a private detective course with a

6 minimum of 1,000 hours of study.

7    Significantly, Law 108 required that the senior

8 executive officer of a security agency possess a private

9 detective license.  Absent from 108 is the definition of

10 "senior executive officer."

11    By replacing Law 108, Senate Project 471 would

12 serve, in part, to protect the private security industry from

13 disloyal competition of those who, without being prepared and

14 without counting on proper certification, offer those

15 services.

16    Senate Project 471 replaced the term "senior

17 executive officer" with "main executive officer."

18    The drafters of Senate Project 471 defined main

19 executive officer as "that officer of the highest rank in

20 management, administration and operations of the security

21 agency and/or corporation as appointed."

22    According to Senate Project 471, the main executive

23 officer of a private security agency must be a private

24 detective, a citizen or a resident of the United States, be

25 authorized to work in the Commonwealth of Puerto Rico, and

1    have filed personal income tax returns in Puerto Rico during

2    the five years prior to applying for a private detective

3    license.

4          This definition makes no reference to private

5    security agencies with headquarters outside of Puerto Rico.

6          A reasonable interpretation of Senate Project 471

7    is that the main executive officer is the highest rank

8    employee within a corporation.

9          Ranger American's highest ranked employee,

10   Mr. Bravo, resided in Puerto Rico.  The highest ranked

11   employee for Loomis and Brinks did not.

12         Victor Rivera-Torres, Mr. Martinez's mentor and

13   legislative advisor, understood that if the main executive

14   officer wasn't from Puerto Rico, he could not operate.

15         Miguel Portilla, founder and head of Capital

16   Security, testified that in 2005, the main executive officers

17   for Loomis or Brinks lacked private detective licenses.

18         Mr. Portilla also testified that Law 108 permitted

19   Loomis and Brinks to operate in Puerto Rico regardless of the

20   parent corporation's location.

21         Jose Velazquez, a legislative advisor to

22   Mr. Martinez, testified on Mr. Bravo's behalf that the

23   private detective license requirement in Senate Project 471

24   "applies to both, the main company that is outside of

25   Puerto Rico, as well as the local branch."

1          The Court finds by a preponderance of the evidence

2     that Mr. Bravo intended to capitalize on an advantage he

3     possessed over his competitors; that is, Mr. Bravo lived and

4     was authorized to work in Puerto Rico, functioned as the

5     highest ranked employee of Ranger American, was a licensed

6     private detective, and had filed income tax returns in

7     Puerto Rico the years before applying or obtaining his

8     private detective license.

9          Nestor Medina, the former general manager for

10    Loomis in Puerto Rico, testified that Loomis earned

11    $1,500,000 in net profit from the armored truck business.

12         Mr. Medina testified that had Loomis and Brinks

13    exited the armored truck market, Ranger American would obtain

14    the business lost by Loomis and Brinks.

15         The Court finds that this is a reasonable

16    inference.  Other security companies in Puerto Rico would

17    have to amass armored trucks, hire qualified administrative

18    and operational personnel, obtain additional capital and

19    funds, and comply with Senate Project 471 after Loomis and

20    Brinks exit the market is dubious, at best.

21         The more reasonable conclusion is that Ranger

22    American, already an established company in Puerto Rico,

23    stood to obtain the armored truck business belonging to

24    Loomis and Brinks.

25         Mr. Bravo argues that Loomis and Brinks would have

1   continued providing armored truck services pursuant to Senate

2   Project 471.  In support of this proposition, Mr. Bravo cites

3   the Commonwealth of Puerto Rico Court of Appeals' decision in

4   *Ranger American of Puerto Rico v. Police of Puerto Rico.*

5           In 2003, Ranger American presented a complaint with

6   the Puerto Rico Police Department alleging that Loomis failed

7   to comply with Law 108 because its senior executive officer

8   lacked the private detective license.

9           Indeed, Mr. Medina testified that Loomis listed

10  Otilio Martinez, a truck driver, as the senior executive

11  officer because Otilio Martinez, not Mr. Medina, qualified as

12  a private detective.

13          The Puerto Rico Police Department revoked Loomis'

14  license but provided Loomis time to comply with Law 108.

15  Loomis appealed the decision.

16          In affirming the revocation of Loomis' license, the

17  Court of Appeals endorsed the following definition of Senior

18  Executive Officer:  "That person with sufficient

19  administrative powers to direct the ordinary operations and

20  to make the ultimate decision of a corporation.  Said officer

21  does not necessarily have to be the officer of highest

22  hierarchy within the corporate scheme of the petitioning

23  company."

24          Loomis' armored truck operations continued without

25  interruption.

1     Mr. Medina ultimately obtained a private detective

2   license, even though the Court of Appeals said that the

3   officer need not necessarily have to be the officer of

4   highest hierarchy.

5     Mr. Bravo presents a false equivalency, that

6   because Loomis continued operation pursuant to Law 108,

7   Loomis could continue to operate following the passage of

8   Senate Project 471.

9     The Court disagrees.  The term "Main Executive

10  Officer" in Senate Project 471 is a term absent from Law 108.

11    While Law 108, as interpreted by the Puerto Rico

12  Court of Appeals, allowed the senior executive officer to

13  qualify in Puerto Rico to qualify for a private detective

14  license, the Main Executive Officer in Senate Project 471 is

15  the highest ranked employee within the company, not simply

16  within Puerto Rico.

17    The change in the definition from "senior" to

18  "main" may appear to be insignificant, but it isn't.  Had

19  Project 471 retained the term "Senior Executive Officer,"

20  then perhaps there would be no confusion.

21    The Court doubts that the highest rank or main

22  executive officer for Loomis or Brinks would relocate, file

23  income tax returns in Puerto Rico for five years, then apply

24  for a private detective license, complete the 1,000-hour

25  private detective course, which is given in Spanish, and

1    finally, obtain the license for the purpose of maintaining

2    their company's armored truck business in Puerto Rico.

3            A senior executive officer, as interpreted by the

4    Puerto Rico Court of Appeals, could much easily obtain a

5    private detective license.

6            The United States probation officer who authored

7    Mr. Bravo's pre-sentence investigation report determined that

8    Mr. Medina's testimony is not sufficiently reliable to

9    conclude that Loomis would exit the Puerto Rico market if

10   Project 471 was approved.  The Court disagrees.

11           The statutory language of Law 108 and Senate

12   Project 471, together with the testimonies submitted at trial

13   by Mr. Medina, Mr. Rivera, Mr. Velazquez and Mr. Portilla,

14   demonstrates that Loomis and Brinks, both headquarters

15   outside of Puerto Rico, did not comply with the Main

16   Executive Officer requirements set forth in Senate

17   Project 471.

18           That Mr. Medina did not have the authority to

19   withdraw Loomis from the Puerto Rico armored truck market is

20   immaterial to the Court's findings, if, indeed, he didn't

21   have the authority.

22           The Court finds that Mr. Medina, as the former

23   general manager of Loomis in Puerto Rico, provided reliable

24   testimony concerning Loomis' operations in Puerto Rico.

25           The probation officer relies on reports obtained

1   from Dr. Juan Lara of Advantage Business Consulting and BDO

2   Puerto Rico.  Unlike the testimony and evidence at trial,

3   however, these reports were prepared and drafted at the

4   behest of Mr. Bravo, and their authors were not subject to

5   cross-examination.

6          The Government's argument today demonstrates the

7   importance of cross-examination.

8          BDO reviewed Loomis' financial statements spanning

9   from 2000 to 2007 stating that "Mr. Medina's testimony that

10  Loomis' armored car services business unit had net income of

11  $1.5 million in the years 2000 to 2005 is not supported by

12  Loomis' financial statements, which suggests a much lower

13  amount."

14         For purposes of sentencing guideline section 2B1.1,

15  however, loss is the greater of actual loss or intended loss.

16         Intended loss is defined as the pecuniary harm that

17  the Defendant purposely sought to inflict, and includes

18  intended pecuniary harm that would have been impossible or

19  unlikely to occur.

20         Actual loss is the reasonably foreseeable pecuniary

21  harm that resulted from the offense.

22         As Mr. Bravo himself set forth in his sentencing

23  memorandum citing *United States v. Vazquez*, a First Circuit

24  Court of Appeals opinion, "Reasonable expectation of the

25  value of the benefit at the time of the crime is a touchstone

1    of the sentencing guideline 2B1.1(b)(2) inquiry."

2         In fact, in *United States v. Appolon*, the First

3    Circuit Court of Appeals held that, "Intended loss is

4    frequently a better measure of culpability than actual loss."

5         The post-*Hoke* assessment rendered by BDO are

6    irrelevant to what Mr. Bravo intended to gain at the time he

7    bribed Mr. Martinez and Mr. De Castro-Font.

8         The Court finds that Dr. Lara's report is also

9    unpersuasive.

10        Dr. Lara concludes that there is no basis to assume

11   that former customers of Loomis Fargo and Company of Puerto

12   Rico would have chosen Ranger American of Puerto Rico, Inc.,

13   over Brinks.  This conclusion assumes that Brinks would

14   remain in the armored truck business after the enactment of

15   Senate Project 471, an assumption that the Court finds

16   suspect.

17        Moreover, Dr. Lara's report is highly speculative

18   and not based -- and based only on certain evidence that he

19   reviewed.

20        According to Dr. Lara, there were at least 15

21   security companies competing in Puerto Rico, some of which

22   could have entered the armored car service business to

23   compete for Loomis' market share.

24        Furthermore, Dr. Lara posits that firms not present

25   in Puerto Rico at the time, but with a strong presence in

1    U.S. mainland markets, could have entered the local armored

2    car service business.  These assessments are pure conjecture.

3          Dr. Lara fails to identify which security companies

4    possessed the capital or the interest in entering the

5    Puerto Rico armored truck business.

6          Also problematic is Dr. Lara's finding that firms

7    from outside Puerto Rico would be capable of providing

8    armored car services in accordance with the requirements set

9    forth in Senate Project 471.

10          Neither report alters the fact that Ranger American

11   was the only established armored truck business in

12   Puerto Rico that could have obtained Loomis' and Brinks'

13   business, or at least a substantial portion of it, with

14   little capital or expenditures.

15          Even assuming that other companies would be

16   interested in entering the armored truck market, Loomis' and

17   Brinks' clients would probably migrate to Ranger American, an

18   establish and well-known armored truck business in

19   Puerto Rico, rather than wait for others to study the market,

20   decide to enter it, and then take all the necessary steps to

21   establish an administration, purchase armored vehicles and

22   other things, hire drivers, guards, and administrative

23   personnel, and ensure that its main executive officer would

24   qualify as a private detective.

25          I am reminded of a quote that Judge Selya said,

1    "Such a question," such as in this case Dr. Lara's report and

2    BDO's report, "would pique the interest of legal scholars,

3    but judges, unlike academicians, are not at liberty to

4    scratch every intellectual itch."

5            The loss benefit calculation is entirely reasonable

6    because it is based on the value of the loss that Loomis,

7    Ranger American's main competitor, would have incurred and

8    the correspondent benefit that Mr. Bravo's company, Ranger

9    American, would have received had Senate Project 471 become

10   law.

11           Mr. Bravo alleges that the decision in

12   *United States v. Ring*, a case from the District of the

13   District of Columbia is dispositive.  The Court disagrees.

14           The *Ring* Court could not arrive at a reasonable

15   estimate of the value to be received because; one, the

16   Government spent almost no time at the second trial

17   discussing appropriations that it used in its benefit

18   calculations; two, the Government presented little to no

19   evidence tying the reward to any corrupt payments by Ring or

20   his conspirators; and, three, the Government has made no

21   effort to distinguish between bribes and gratuities when

22   discussing the corrupt payments it claims are connected to

23   benefits to Ring's clients.

24           Contrary to the facts in *Ring*, in this case the

25   Court and the jury heard testimony by two of Ranger

1    American's competitors, one of whom testified about the

2    amount of money that would be lost to Loomis and the

3    Puerto Rico Legislature enacted Senate Project 471.

4            Lastly, even though no actual loss occurred, the

5    Court may calculate intended loss and sentence Mr. Bravo

6    accordingly.  It is sensible to follow the Common Law Rule

7    that a person is presumed to have generally intended the

8    natural and probable consequences of his or her action.

9            In *United States v. Muhammad*, a Seventh Circuit

10   Court of Appeals decision, the Court affirmed an 11 level

11   enhancement pursuant to sentencing guideline section

12   2C1.1(b)(2)(A) and 2F1.1(b)(1)(L).

13           The defendant in *Muhammad* served as a juror and

14   solicited a $2,500 bribe from the defendant in a civil trial

15   to sway his fellow jurors to find in the civil defendant's

16   favor.  Law enforcement officers, however, arrested the juror

17   before the commencement of jury deliberations.

18           The District Court relied on the $933,000 jury

19   verdict in the civil trial as the benefit to be received.

20           The Defendant argued that this sum was to

21   speculative, arguing that had been participated in the jury

22   deliberation, the jury may have found in favor of the civil

23   defendant.

24           The Seventh Circuit Court of Appeals rejected the

25   defendant's argument noting that "the District Court

1  possessed a quantifiable figure for the benefit that the

2  litigant would have received had the defendant's scheme

3  worked."

4  The fact that the bribe proved unsuccessful "does

5  not prevent us from using the ascertainable benefit that the

6  bribe intended to influence in order to enhance his

7  sentence."

8  Similarly, in *United States v. Falcioni*, the Second

9  Circuit Court of Appeals held that "simply because the

10 government's crime prevention efforts prove successful,

11 however, it does not mean that the intended loss is zero."

12 At the 2012 sentencing following Mr. Bravo's first

13 trial for section 666 bribery, the Court relied on

14 Mr. Medina's testimony that Loomis' gross revenues for 2005

15 were $10 million and his net revenues were $1,500,000.

16 In 2005, Loomis' gross revenue was $10,093,308.

17 For that same year, however, Loomis' net revenue was

18 $763,344.

19 The total gross revenues of the three private

20 security companies who were in the armored truck business in

21 Puerto Rico was $26,972,102.

22 Ranger American controlled approximately

23 45.7 percent of the market.  Accordingly, a conservative and

24 reasonable estimate is that, had Senate Project 471 been

25 enacted and had Loomis gone out of business, as Mr. Bravo

1    intend, Ranger American would have garnered approximately

2    45.7 percent of Loomis' market share, resulting in $4,612,642

3    in additional gross revenue to Ranger American.

4            The benefit to be received by Ranger American,

5    however, must be calculated using net rather than gross

6    revenues.

7            Ranger American's net revenue in 2005 was

8    $1,661,884, which is 13 percent of $12,340,321, its gross

9    revenue for 2005.

10           Calculating 13.5 percent of the 2005 gross revenue

11   results in at least $622,707 as the net gain that Ranger

12   American would have or could have received in 2005 had Senate

13   Project passed and had Loomis ceased operations in

14   Puerto Rico.

15           A 14 level enhancement is applicable because

16   $622,707 is a conservative and reasonable estimate of the

17   benefit Ranger American would have received if Senate

18   Project 471 had been enacted and had Loomis ceased operations

19   in Puerto Rico.

20           Because Mr. Martinez and Mr. De Castro-Font were at

21   the time of the offense elected public officials in high

22   level decision-making positions, the base offense level is

23   increased by four levels pursuant to sentencing guideline

24   section 2C1.1(b)(3).

25           Mr. Bravo's total offense level is 32.