# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

## No. 18-1358
_____


## UNITED STATES,
### Appellee

### v.

## JUAN BRAVO FERNANDEZ,
### Appellant

_____

## ON APPEAL FROM A JUDGMENT ENTERED IN THE UNITED STATES
## DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO
_____

## REPLY BRIEF OF APPELLANT JUAN BRAVO FERNANDEZ
_____

**Kimberly Homan**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-8616 (Telephone)**
**(617) 338-9538 (Fax)**
**homanlaw@aol.com**

**Martin G. Weinberg**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**(617) 338-9538 (Fax)**
**owlmgw@att.net**

# TABLE OF CONTENTS

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.  THE EVIDENCE WAS INSUFFICIENT TO SUPPORT
    BRAVO'S CONVICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  The Evidence Failed to Prove that an Entity of the
        Puerto Rico Government Received More than
        $10,000 in Federal Program Benefits . . . . . . . . . . . . . . . . . 4

        1.  Defendants' arguments are not foreclosed
            by *Fernandez* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        2.  The stipulation did not satisfy the government's
            burden of proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3.  At minimum, the erroneous instruction requires
            a new trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.  No Reasonable Jury Could Conclude Beyond a
        Reasonable Doubt that the Las Vegas Trip Was a
        Quid Pro Quo Corruptly Given in Exchange for an
        Official Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II. THE COURT'S INSTRUCTIONS TO THE JURY DENIED
    DEFENDANTS A FAIR TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.  Failure to Fully Inform The Jury Regarding What Is
        Not a Bribe Under §666 . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B.  Failure to Instruct the Jury that It Was Required to
        Find that Martinez and de Castro Font Changed Their
        Positions on 410 and/or 471 . . . . . . . . . . . . . . . . . . . . . . . 21

C.  Erroneous Instructions That the Jury Was Not to
Consider the Merits of Senate Projects 410 and 471
for Any Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

III.  THE COURT ERRED IN EXCLUDING IMPORTANT
DEFENSE TESTIMONY . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

IV.  THE DISTRICT COURT ERRED IN CALCULATING
BRAVO'S GUIDELINES OFFENSE LEVEL . . . . . . . . . . . . . .    25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . .    29

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

# TABLE OF AUTHORITIES

## Cases

*Arcam Pharm. Corp. v. Faria*, 513 F.3d 1 (1st Cir. 2007) . . . . . . . . . .     5

*Arizona v. California*, 460 U.S. 605 (1983) . . . . . . . . . . . . . . . . . . . . .    15

*Bravo-Fernandez v. United States*, 137 S. Ct. 352 (2016) . . . . . . . . . . .    19

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
    499 U.S. 365 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

*Fischer v. United States*, 529 U.S. 667 (2000) . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11,
                                          13, 15, 17

*United States v. Acevedo-Lopez*, 873 F.3d 330 (1st Cir. 2017) . . . . . . .    27

*United States v. Agostino*, 132 F.3d 1183 (7th Cir. 1997) . . . . . . . . . . .    18

*United States v. Brown*, 727 F.3d 329 (5th Cir.2013) . . . . . . . . . . . . . .    13

*United States v. Brown*, 623 F.3d 104 (2d Cir. 2010) . . . . . . . . . . . . . .    15

*United States v. Burgos*, 703 F.3d 1 (1st Cir. 2012) . . . . . . . . . . . . . . .    14

*United States v. Dubon-Otero*, 292 F.3d 1 (1st Cir. 2002) . . . . . . . . . . . 8, 9, 10, 11

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013) . . . . . . . . . . . . .  5, 6, 15,
                                          18, 21

*United States v. Grace*, 568 Fed. App'x 344 (5th Cir. 2014) . . . . . . . . .    22

*United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982) . . . . . . . . . . . . .    22

*United States v. McDonough*, 727 F.3d 143 (1st Cir. 2013) . . . . . . . . . . 17, 18, 21

*United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015) . . . . . . . . . . .   12, 13

*United States v. Medina-Villegas*, 700 F.3d 580 (1st Cir. 2012) . . . . . . .   6

*United States v. Morillo*, 158 F.3d 18 (1st Cir. 1998) . . . . . . . . . . . . . .   14

*United States v. Paixao*, 885 F.3d 1203 (9th Cir. 2018) . . . . . . . . . . . .   10

*United States v. Paquette*, 201 F.3d 40 (1st Cir. 2000) . . . . . . . . . . . . .   15

*United States v. Rivera-Martinez*, 931 F.2d 148 (1st Cir. 1991) . . . . . . .   15

*United States v. Robinson*, 663 F.3d 265 (7th Cir. 2011) . . . . . . . . . . . .   13

*United States v. Sabean*, 885 F.3d 27 (1st Cir. 2018) . . . . . . . . . . . . . .   20

*United States v. Suhl*, 885 F.3d 1106 (8th Cir. 2018) . . . . . . . . . . . . . .   27

*United States v. Wallace*, 573 F.3d 82 (1st Cir. 2009) . . . . . . . . . . . . .   15

*United States v. Willis*, 844 F.3d 155 (3d Cir. 2016) . . . . . . . . . . . . . .   10, 11

*White v. Murtha*, 377 F.2d 428 (5th Cir.1967) . . . . . . . . . . . . . . . . . . . .   15

## Statutes and Rules

18 U.S.C. §666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   *passim*

## Other Authorities

S. Rep. No. 98-225 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

# STATEMENT OF FACTS

Before responding to the arguments advanced by the government, certain misstatements in the government's Statement of Facts require correction. First, Bravo did not provide an "all-expenses-paid" trip. Consolidated Answering Brief for the United States ("GB") at 3, 6; *see* Brief of Appellant Juan Bravo Fernandez ("BB") at 12. There was no evidence regarding who actually paid for the flights, and, as the government later acknowledges, Bravo did not pay for the second night of Martinez's stay in Las Vegas. *See* GB:9.

Second, 471 would not have curtailed Ranger's competition. *See* GB:4. Loomis' Medina did not have a license only because he was flouting the law, not because he was ineligible to be licensed; when forced to obtain a license, he did so. *See* BB:8 n.6. There was no evidence regarding the licensing eligibility of the main executive officer of Brinks, the other armored car services provider.

Third, 410's code of conduct would have been "enforced" by Ranger's security guards only to the extent that they could ask persons violating the code to leave; actual enforcement would have been left to the police. *See* GB:5; App:2411-12. The undisputed evidence was that the passage of 410 would not have added so much as a penny to Ranger's coffers. *See* BB:5.

Fourth, Portilla did not testify that 471 *would* force Ranger's armored-car competitors to close down, GB:5; what he said was that those competitors would have

to close *if* they could not meet 471's requirements. App:1503, 1510-11. That "if" would come to pass only if the government's interpretation of 471 to require the head of the foreign parent company to be licensed were correct, for which the only evidence is the opinion of an aggrieved competitor. As Bravo has argued, the more natural and sensible interpretation is that licensing of the head of the Puerto Rico corporation would have satisfied 471's licensing requirement. *See* BB:65.

Fifth, Bravo did not bring "completed drafts" of 410 and 471 to Martinez, which were then simply reformatted to appear to have been drafted by legislative staff. *See* GB:6. The government's own witness testified that the version of 410 with which Bravo provided Martinez was a "rough draft." App:852. Velazquez testified that the draft Martinez gave him to work on came not from Bravo but from the ICSC, *see* BB:5 & n.1, and that he made both changes and additions to the draft. App:2388-96. Similarly, Velazquez researched 471 and redrafted it based on his research and his prior experience with the issues it was intended to address. App:2420-34, 2450. This was not the rubber stamp of Bravo's proposals that the government seeks to suggest.

Sixth, Bravo may have called Martinez and de Castro Font on the evening of the day he obtained the fight tickets, GB:7, but the record is silent as to the content of these brief calls. *See* BB:33 n.18. Seventh, Velazquez testified that there was no

significance to the March 2 date for the submission of 410 to the Senate; Martinez did not instruct him to submit it on that date. App:2397. That testimony eliminates the link that the government seeks to draw between obtaining the tickets and the submission of 410 to the Senate. *See* GB:7. Similarly, Velazquez testified that there was no significance to the fact that 471 was submitted to the Senate on March 18. App:2455-56.

Eighth, Martinez may have had the "power" to schedule hearings and decide who would testify, GB:7-8, but with respect to 410 and 471, these functions were performed by Velazquez and other administrative staff, without input from Martinez. The decisions regarding whom to invite to testify at the hearings were made by Velazquez, not Martinez. *See* BB:35-36.

Ninth, the submission of 410 to the Rules Committee on May 18 was not related to the Las Vegas trip, *see* GB:9, but was instead a function of the date on which the last of the three committees to which it had been assigned approved it. App:2407-08.

Tenth, Bravo's 2008 conversations with Diaz cannot reasonably be regarded as indicia of Bravo's "cover[ing] [his] tracks." GB:10-11. Telling de Castro Font, a serial extortionist, three years after the trip that *he* should be careful is hardly Bravo covering his own tracks. *See* BB:37 n.31.

Eleventh, 471 would not have made it more difficult to obtain a license, *see* GB:4, for the reasons addressed in Bravo's opening brief. *See* BB:64-68. In fact, in one important respect, 471 expanded the category of persons eligible for licensing; the existing legislation limited licensing to citizens, while 471 also permitted legal residents to be licensed. App:1636-37; 2431. Passing an examination was already required under 108; it was not an additional burden to be imposed. App:1536.

## ARGUMENT

### I. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT BRAVO'S CONVICTION.

#### A. The Evidence Failed to Prove that an Entity of the Puerto Rico Government Received More than $10,000 in Federal Program Benefits.[1]

##### 1. Defendants' arguments are not foreclosed by *Fernandez*.

The government first accuses defendants of "misconstru[ing] the evidence and

---

[1] The government references the district court's conclusion, in denying Bravo's Rule 29 motion, that under this Court's earlier opinion in this case, evidence that Puerto Rico received $4.7 billion in federal funds sufficed to prove the $10,000 federal-program-benefits element. GB:24-25. What the government does not mention is that the district court later revised its thinking on this issue. In its order granting bail pending appeal, the court concluded, after renewed analysis of the applicable law, that "[b]ecause the terms 'funds' and 'benefits' are not synonymous with each other, a substantial question of law exists regarding the sufficiency of the parties' joint stipulation to satisfy an essential element of the offense." Doc. 1061 at 7. The court further concluded that this Court's *Fernandez* decision "has no bearing on whether the stipulation . . . is sufficient to sustain the defendants' section 666 convictions." *Id.* at 9.

arguments in the first trial and appeal." GB:27. They did no such thing.[2] Contrary to the government's argument, GB:28-29, defendants did not argue in the first appeal that the government's evidence regarding the $10,000 jurisdictional element was insufficient. All references to the jurisdictional element were made in the context of contending that the "agency" element was not satisfied. The legal question before the Court in *Fernandez* was not whether evidence that Puerto Rico received $4.7 billion in federal funds satisfied §666's jurisdictional requirements, but rather whether Martinez and de Castro Font were agents of the government entities receiving the funds. Once the Court decided that they were agents of the Commonwealth of Puerto Rico, the inquiry before the Court was at an end. To resolve the question before it, the Court had only to say that "[b]ecause Martinez and de Castro Font are agents of the Commonwealth, the evidence was sufficient" to support their convictions. *See United States v. Fernandez*, 722 F.3d 1, 9 (1st Cir. 2013). Because the Court's observation regarding the $4.7 billion in federal funds was not "essential to the result reached in the case," *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007), it

---

[2]  At the first trial of this case, there was testimony that the Senate childcare program received monies to provide meals for children attending the daycare. Doc. 391 at 20-21, 26, 28. *See* BB:26 n.13. It hardly matters that the witnesses at the first trial spoke in terms of "funds" rather than "benefits," GB:27, as this was a determination for the jury, not the witnesses, to make. For whatever reason, the government opted not to present this evidence at the second trial.

was not part of the Court's holding but was instead, as Bravo has argued, non-binding dictum. *See* BB:25-26.

In assessing what the Court did and did not decide in *Fernandez*, it is irrelevant that §666 has a $10,000 jurisdictional element. *See* GB:29-30. Appellate courts only decide the issues presented to them; where the sufficiency of the evidence as to certain elements of the government's proof is challenged, courts decide those challenges but do not go beyond what the defendant argues to assess whether *all* the elements of the offense were proven in the absence of a challenge directed to those elements. Contrary to the government's argument, GB:29, it was not necessary for the Court to decide whether *all* the statutory elements had been proven to decide the issues that were actually presented to it.

Nor does the law-of-the-case doctrine foreclose the issue. *See* GB:30 & n.30. In the sole case cited by the government, *United States v. Medina-Villegas*, 700 F.3d 580 (1st Cir. 2012), the defendant, unlike his codefendant, "oddly" did not raise a double jeopardy argument on appeal; the Court ruled in favor of the codefendant but declined to extend the same relief to the defendant. *Id.* at 584-85. On remand for resentencing, the defendant belatedly sought to raise the double jeopardy argument. Because, under the law-of-the-case doctrine, "a successor appellate panel in the same case is normally bound to respect the decision of the original panel," the Court found

itself bound to follow the prior panel opinion denying double jeopardy relief. *Id.*

In *Medina-Villegas*, unlike this case, the defendant's belated double jeopardy claim was exactly the same as that he could have raised in his first appeal. Here, the defendants present in this appeal a sufficiency of the evidence argument based on the dispositively different record at the retrial of the case. That retrial, for reasons known only to the government, did not include the evidence of the federal monies received by the Senate childcare program which the district court concluded, in denying defendants' Rule 29 motions at that trial, satisfied the government's burden of proof of the "benefits" element. *See* BB:26 n.13. Whether that evidence actually satisfied the federal program benefits element was not before the Court in the first appeal, and it is not before the Court now, given the absence of that evidence from this evidentiary record. The question before the Court in this case is whether the §4.7 billion funds evidence, standing alone, would permit a rational juror to find that the federal program benefits element was proven beyond a reasonable doubt.

The government has cited no case that deals with the circumstances present here: a second trial with a different evidentiary record from the first. Here, it was only after the government's evidentiary presentation ended without proof of the federal program benefits elements that the issue crystallized for raising in defendants' Rule 29 motion and on appeal. This was a second trial of this case, at which the

government again bore the burden to prove every element of the offense beyond a reasonable doubt, and nothing in *Fernandez* relieved it of that burden. Even if the evidence was sufficient to prove a particular element at the first trial, that does not insulate from appellate review a challenge to the sufficiency of the evidence on that element at the second trial, especially where, as here, the record evidence differs from that presented at the first trial. Defendants could not have contested in 2011 the sufficiency of the evidence at the 2017 trial, which was different from the record at the first trial (and critically deficient). The issue here is the sufficiency of evidence in 2017, not 2011. That issue could not have been litigated (much less decided) in the first appeal.

> **2.     The stipulation did not satisfy the government's burden of proof.**

The government's effort to narrowly cabin *Fischer* and *Dubon-Otero* to apply only to cases of "indirect" benefits should be rejected. Under *Fischer* and *Dubon-Otero*, the government must prove, in *every* §666 case, whether the payments are direct or indirect, that the monies at issue were federal program benefits, and it failed to do so here.[3] Neither case suggests the limitation advanced, without support in

---

[3] The government's statement that *Fischer* involved "a legal [issue] as opposed to a question of proof," GB:31, is a curious one. If the payments to the hospital were not federal program benefits within the meaning of §666, then the evidence would have been insufficient to support the defendant's conviction.

either those cases or any other case, by the government. The payments to the Medicare providers in *Fischer* were "benefits" under a federal assistance program because they "assist[ed] the hospital in making available and maintaining a certain level and quality of medical care, all in the interest of both the hospital and the greater community." *Fischer v. United States*, 529 U.S. 667, 679-80 (2000). There was nothing "indirect" about the payments, as they were made directly from Medicare to the hospital, nor did *Fischer*, as the government appears to suggest, GB:32, divide the universe of funds into "point-of-sale transactions," which are not "benefits" under §666, and everything else, which are. Indeed, the *Fischer* Court expressly disavowed the position advanced by the government here—that the fact that the funds came from the federal government suffices, without more, to establish that they are "benefits" (unless they fall within the §666(c) exceptions). *See id.* at 677 (rejecting the government's "broader position" that the sole determinant should be "whether the Federal Government was the source of the payment"). Nothing in *Fischer* (or *Dubon-Otero*) remotely suggests that it is ever permissible to simply intuitively assume, as the government advocates, that a large sum of money given by the federal government to a governmental entity is a "benefit" within the meaning of §666. Applicability of the *Fischer* analysis is not limited to cases in which it is difficult to

determine whether the payments were "benefits." *See* GB:33.[4] Sometimes the determination will be easy, and at other times more difficult, but at least *some* analysis must be undertaken in *every* case.

*United States v. Willis*, 844 F.3d 155 (3d Cir. 2016), the sole case on which the government relies for the proposition that the government need prove only that a governmental entity received a large sum of money from the federal government, GB:34-35, has never been followed by any other court (and has only once been cited outside the Third Circuit). Its holding is fundamentally inconsistent with both *Fischer* and *Dubon-Otero*, as well as all the other cases which defendants have cited that have faithfully applied the *Fischer* analysis to the "benefits" issue. *Willis* concluded that the monies received by the Virgin Islands legislature were "benefits" because they

---

[4] *United States v. Paixao*, 885 F.3d 1203 (9th Cir. 2018), did not say that it was necessary to apply the *Fischer* factors only when "it is not immediately clear" that the payments were a "benefit." GB:33. On the contrary, *Paixao* affirmed that the *Fischer* analysis must be undertaken in every case:

> Because not all payments under federal programs qualify as "benefits," the Court adopted a context-specific test that requires an examination of the federal program's "structure, operation, and purpose." . . . The Court further instructed us to "examine the conditions under which the organization receives the federal payments." . . . *Notably, the inquiry turns on the attributes of the federal program, not on the characteristics of the recipient organization.*

*Id.* at 1206 (emphasis added). Here, of course, the government presented no evidence as to the federal programs (if any) that were the source of the §4.7 billion in federal funds received by Puerto Rico.

"significantly supported" the government. *Id.* at 168. Many types of payments can provide "significant support," including those exempted under §666(c)—"salaries, wages, fees or other compensation paid, or expenses paid or reimbursed, in the usual course of business," and it cannot simply be assumed, as the *Willis* Court did, that such payments always and necessarily constitute "benefits" within the meaning of §666. And *Willis* entirely ignored another statutory requirement: that the payments have been made "under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." §666(b). Without at least some evidence regarding the federal program that supplied the funds and the purposes to which those funds were put, it is impossible to find the "benefits" and "federal program" elements proven.

Where direct payments from the federal government to a government entity are at issue, the government's burden may in some cases be easy to satisfy, but it is up to the government to shoulder that burden and introduce at least some evidence from which a beyond-a-reasonable-doubt determination can be made by the trier of fact that the funds at issue were "benefits" within the meaning of §666. The government chose not to introduce at this trial the evidence regarding federal payments for daycare lunches (or any evidence regarding any federal programs providing funds to Puerto Rico sufficient to satisfy the *Fischer/Dubon-Otero* "benefits" analysis), and

it must live with the consequences of that decision.

Nothing in *United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015), turned on whether the payments were "direct" or "indirect," GB:35, nor does *Fischer* support such a distinction. That distinction may affect the scope of the analysis required, but it does not eliminate the need for the inquiry in direct-payment cases. *McLean* says as much: "*[R]egardless of whether an agency receives federal funds directly or indirectly*, there must be a nexus between the funds and their ultimate use to satisfy §666. *Id.* at 1240 (emphasis added). Indeed, this analysis is required to ensure that the application of §666 remains within permissible constitutional bounds.

> [T]o constitutionally cabin §666 courts must evaluate a federal program's "structure, operation, and purpose" to determine if the federal receipts qualify as benefits. *Failure to conduct this necessary investigation violates* Fischer's *admonition that §666 is not a boundless statute that applies to virtually every state bribery or fraud case.*

*Id.* (emphasis added). Nor was the outcome in *McLean* affected by the absence of evidence regarding the amount of federal funds received by the agency. The record in *McLean* "establishe[d] that the City received federal funds and that the City transferred, in one form or another, federal funds to the MCRA during fiscal years 2012 and 2013." *Id.* at 1243. The ultimate problem for the government was that testimony characterizing the funds as a "stimulus package" or "federal stimulus program" did not supply sufficient information regarding the federal program

providing the funds to permit the required analysis to determine whether the funds were "benefits" under *Fischer*. *Id.* at 1244.[5]

Yes, the Supreme Court has said that bribery of officials of governments receiving federal funds is a legitimate federal concern, GB:36, but Congress did not draft a statute which criminalizes bribery in connection with *any* receipt of *any type* of federal funds. Instead, consistently with the limits of federalism, *see* BB:20-21, Congress confined the reach of §666 to "benefits" received under a "federal program." *See* S. Rep. No. 98-225 at 370 (1984)(stating that the concept of "federal program" is "not unlimited," but instead requires that "there must exist a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives").

---

[5] The *McLean* footnote referenced by the government, GB:33, 34, was directed to the question whether testimonial evidence alone can suffice to prove the federal program benefits issue, and the "direct" benefit cases were distinguished in that context. *See id.* at 1244 n.5. In *United States v. Brown*, 727 F.3d 329, 336-37 (5th Cir.2013), the defendants argued only that testimonial evidence, unsupported by documentary corroboration, did not suffice to prove the "benefits" element; they did not otherwise challenge the sufficiency of the evidence on the issue. In *United States v. Robinson*, 663 F.3d 265, 269-70 (7th Cir. 2011), there was evidence that the city of Chicago received a federal law-enforcement grant that would be used to purchase police vehicles and fund an outreach program. Where "indirect" payments are concerned, the analysis may require different types of proof, but the fact that the payments are "direct" does not obviate the need for any analysis at all.

Where the government fails to present *any* evidence of the  federal program under which the funds were provided or the purpose for which they were used, the jury cannot make a "common-sense" inference that the funds were benefits within the meaning of §666. Inferences must be "supported by the evidence," *United States v. Burgos*, 703 F.3d 1, 11 (1st Cir. 2012), and "in applying their common sense, the jurors cannot convict unless the evidence is sufficient to find guilt beyond a reasonable doubt." *United States v. Morillo*, 158 F.3d 18, 22 (1st Cir. 1998). There was no such evidence in this case.

More importantly, this was not an inquiry that the jury was instructed to undertake, never having been told that it was required to find, as an essential element of the §666 offense charged, that Puerto Rico had received more than $10,000 in "benefits" under a "federal program" during the applicable time period. Therefore, jurors had no occasion to apply their "common sense" to the issue because they were not given any indication that there was an issue before them to consider, using their common sense or otherwise. Given the stark absence of evidence in this case regarding the programmatic source, nature, and purpose of the funds provided to Puerto Rico, the jury could not reasonably infer, beyond a reasonable doubt, based on the evidence introduced at this trial of this case, that those funds included

"benefits," as that term is used in §666. Bravo's conviction should be reversed.[6]

### 3. At minimum, the erroneous instruction requires a new trial.

After actively encouraging the trial court to give the erroneous instruction, *see* BB:28, the government now concedes that the "funds" instruction was erroneous. GB:47, 50.[7] Contrary to the government's argument, the error was not harmless. For

---

[6] Even had *Fernandez* decided the issue, which it did not, this Court remains free to revisit the issue rather than permit a manifestly erroneous statement of the law to stand. "Under law of the case doctrine, . . . it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." *Arizona v. California*, 460 U.S. 605, 619 (1983). *See, e.g., United States v. Brown*, 623 F.3d 104, 111 (2d Cir. 2010)("[T]he law of the case doctrine does not deprive an appellate court of discretion to reconsider its own prior rulings, even when the ruling constituted a final decision in a previous appeal."); *United States v. Paquette*, 201 F.3d 40, 43 n.2 (1st Cir. 2000)("The law of the case is not binding in a later proceeding if . . . the decision was clearly erroneous and would work a manifest injustice."); *United States v. Rivera-Martinez*, 931 F.2d 148, 151 (1st Cir. 1991)(previously decided issues may be reopened if "the decision was clearly erroneous and would work a manifest injustice," *quoting White v. Murtha*, 377 F.2d 428, 432 (5th Cir.1967)). Any decision that a showing of no more than that Puerto Rico received $4.7 billion in federal funds suffices to prove §666's federal program benefits elements (assuming *arguendo* that there was one) would be clearly erroneous. The manifest injustice requirement would be satisfied as well. "A finding of manifest injustice requires a definite and firm conviction that a prior ruling on a material matter is unreasonable or obviously wrong, as well as a finding of prejudice." *United States v. Wallace*, 573 F.3d 82, 89 (1st Cir. 2009). The prejudice to defendants is obvious, in that letting the language of *Fernandez* control this case would permit the defendants to be convicted in the absence of proof beyond a reasonable doubt of all elements of the offense.

[7] The government characterizes the court's error as "understandable" because courts sometimes use "funds" and "benefits" interchangeably. GB:49. *Fischer*, however, makes it abundantly clear that "funds" and "benefits" are *not* synonymous.

reasons addressed in Bravo's opening brief and in the preceding section, a properly instructed jury could not determine beyond a reasonable doubt that Puerto Rico received more than $10,000 in federal program benefits, as the government failed to produce the evidence necessary to support such a conclusion.

The omitted element here *was* contested. *See* GB:50. At the outset of the trial, the defendants explicitly asserted their position that the "funds" stipulation did not prove that the $10,000 federal program benefits element had been satisfied, App:531, and thus the government is flatly incorrect in stating that the defendants "never contested at trial the fact that Puerto Rico received at least $10,000 in federal *benefits*." GB:51 (emphasis added). Moreover, defendants moved for judgments of acquittal on this ground and objected to the instruction given. Given the court's instruction, the defense could not plausibly argue to the jury that the federal program benefits element—about which the jury was not told—had not been proven.

The evidence that Puerto Rico received more than $10,000 in federal program benefits was not "overwhelming," GB:51; it was non-existent. A properly instructed jury could not have found, based on the evidence presented by the government, that Puerto Rico received more than $10,000 in federal "benefits" under a "federal program." A general sense that Puerto Rico must have used at least some of the funds to promote the "well-being" of its citizens cannot substitute for evidence that a

particularly-identified federal program provided the funds for a purpose that can properly be characterized as a "benefit" under §666. The government has cherry-picked a few words from *Fischer* and ignored what *Fischer* tells us regarding how the issue is to be determined. *See, e.g.*, GB:36-37 (linking a few words from page 677 of *Fischer* with a few words from page 680 of *Fischer*). And had the jury been properly instructed, the defense would have been able to argue to the jury that it could not find the federal program benefits element satisfied based on nothing more than the "funds" stipulation. But it was not so instructed, and such an argument could not credibly be made in that instructional vacuum. It cannot be said that the jury's verdict would have been the same absent the error, and Bravo's conviction should be vacated.[8]

### B. No Reasonable Jury Could Conclude Beyond a Reasonable Doubt that the Las Vegas Trip Was a Quid Pro Quo Corruptly Given in Exchange for an Official Act.

Contrary to the government's argument, the "temporal connections" shown by the evidence, a number of which have been shown by Bravo to be illusory, do not prove  beyond a reasonable doubt that trip expenses paid by Bravo were a quid-pro-quo bribe as opposed to a gratuity.  Temporal coincidence does not, without more, establish an illegal quid pro quo. Neither *United States v. McDonough*, 727 F.3d 143

---

[8] Bravo also adopts the arguments set forth in Section I of the Reply Brief of Appellant Hector Martinez.

(1st Cir. 2013), nor *United States v. Agostino*, 132 F.3d 1183 (7th Cir. 1997), stands

for the proposition that temporal proximity between payment and official act suffices,

without more, to establish the existence of a quid pro quo.[9]

The government never explains why the temporal overlap proves a quid-pro-

quo bribe, as opposed to "a reward for some future act that the public official will

take (and may have already determined to take), or for a past act that he has already

taken," *Fernandez*, 722 F.3d at 19, *i.e.*, a gratuity. This Court made it clear in

*Fernandez* that "the timing of the payment may not provide a conclusive answer as

to whether that payment is a bribe or a gratuity." *Id.* It did not do so here.

Bravo did nothing that could be described as trying to cover his tracks, *see*

page 3, *supra*, and the events surrounding the trip to Las Vegas were remarkably

---

[9] *McDonough* involved a stream of monthly payments over a two-year period when the legislator took action to advance the interests of the payor, *see* 727 F.3d at 148-49, which the Court described as a "classic kickback scheme." *Id.* at 153. As such, it bears no resemblance to this case. *Agostino* said no more than that the timing "provided circumstantial evidence" of corrupt intent. 132 F.3d at 1193. In addition to timing, *Agostino* also pointed to evidence that the defendant had asked a subordinate to disregard contract procedures; that the defendant was providing extra noncontractual benefits to a benefactor (who provided the alleged bribe money); that his subordinate expressed surprise at that development and objected to it, and that the defendant offered money in response to his subordinate's objections. 132 F.3d at 1192-93. In neither case did the court grapple with the bribery/gratuity distinction so central to this case.

open—the men traveled openly together, socialized openly with each other in Las Vegas, and attended the fight openly together, conduct more consistent with the trip's having been a gratuity rather than a corrupt bribe.

Yes, corrupt agreements are often secret and informal and subject to proof only through circumstantial evidence, GB:39, but the government, despite every opportunity to do so, has not pointed to any evidence that would permit a rational juror to conclude, beyond a reasonable doubt, that the agreement here was a corrupt one to give and accept a bribe, as opposed to an agreement to give and accept a gratuity.[10]

## II. THE COURT'S INSTRUCTIONS TO THE JURY DENIED DEFENDANTS A FAIR TRIAL.

Considering the district court's instructions "in their totality," they did not

---

[10] What the Supreme Court said in during oral argument of the double jeopardy issue raised in that case is fundamentally irrelevant to the issue raised here. This Court, which carefully scrutinized the distinction between bribery and gratuities, found the record in the prior trial—a trial in which the evidence was not "essentially identical," GB:40 n.5, but was, in fact less favorable to the defendants than is the record at the second trial—consistent with the giving of a gratuity, *see* BB:41, something the government neglects to mention. *See Bravo-Fernandez v. United States*, 137 S. Ct. 352, 364 (2016)("The evidence presented at petitioners' trial, the Court of Appeals determined, supported a guilty verdict on the gratuity theory (which the First Circuit ruled impermissible) as well as the quid pro quo theory (which the First Circuit approved."). Indeed, the Supreme Court went so far as to say, in its written opinion, that "we do not know what the jury would have concluded had there been no instructional error." *Id.* at 366.

19

"furnish a set of instructions composing, in the aggregate, the proper legal standards to be applied" in this case." GB:48, *quoting United States v. Sabean*, 885 F.3d 27, 44 (1st Cir. 2018).

### A. Failure to Fully Inform The Jury Regarding What Is Not a Bribe Under §666.

The government has largely ignored the defendants' arguments regarding why the district court's instructions failed to provide the jury with adequate guidance regarding how to draw the critical distinction between bribery and gratuities. *See* BB:41-46. The government has not suggested that the instruction requested by the defendants was incorrect or that there was any other reason that it should not have been given. *See* GB:54.

It matters not that the district court's bribery instructions were correct, *see* GB:53, as the issue concerns the court's *gratuity* instructions and their failure to provide the jury with the guidance it needed to fairly assess whether the Las Vegas trip was a corrupt bribe, punishable under §666, or instead a gratuity, which is not. Given the disjunction between the court's instructions regarding the elements of §666 and its bribery instructions and its failure to link the quid-pro-quo requirement to either the corrupt intent element or the "influence or reward" language that it had liberally employed in defining the elements of §666, *see* BB:38-41, it cannot be said

with any assurance that the jury would have had a clear understanding of this outcome-determinative distinction or that, without further elucidation of just what the term "gratuity" encompasses, that the fact that the jury could not convict defendants based on the giving or accepting of a gratuity was "clearly covered" in the charge. *See* GB:54.

Defendants did not "complain" of the use of the word "reward" in the instructions, GB:54; they could hardly do so, as the word appears in the statute and this Court has said that a reward may be a bribe. But this Court has also said that a "reward" may be a gratuity, *Fernandez*, 722 F.3d at 19, quoted at page 18, *supra*, and therein lies the problem: that the instructions failed to adequately inform the jury regarding the distinction between a bribery reward and a gratuity reward.

### B.    Failure to Instruct the Jury that It Was Required to Find that Martinez and de Castro Font Changed Their Positions on 410 and/or 471.

Defendants have acknowledged the contrary holding of this Court's *McDonough* decision, BB:49-50, and the government has failed to acknowledge this Court's prior decisions that have spoken in terms of the official's altering his official acts. *See* BB:48-49.[11] Defendants have explained why, in this Circuit, where the

___

[11] In support of its argument, the government quotes dictum from a civil antitrust case, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 368 (1991), GB:55, which also termed the defense "often plausible in fact." *Id.* In *United*

difference between a bribe and a gratuity is a difference between guilty and not guilty, and under the circumstances of this case, the requested instruction should have been given. Because the government has chosen not to respond to those arguments, defendants continue to rely on the arguments presented in their opening brief. *See* BB:47-52.

## C. Erroneous Instructions That the Jury Was Not to Consider the Merits of Senate Projects 410 and 471 for Any Purpose.

Contrary to the government's argument, GB:57, the instructions as given did not "substantially cover[]" the issue. The court may have told the jury that the defendants "contend[]" that they acted in good faith based on their beliefs that 410 and 471 were beneficial for the citizens of Puerto Rico, *see* GB:57, but the instructions effectively nullified the good faith instruction by telling the jury it could

_____

*States v. Grace*, 568 Fed. App'x 344, 349-50 (5th Cir. 2014), on which the government also relies, the court addressed the instruction that "[i]t is not a defense . . . to claim that a public official would have lawfully performed the official action in question even without having accepted a thing of value," only in the context of defendant's honest services conviction, not §666. *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982), was a Hobbs Act case, not a §666 case. So while it is true that defendants have not cited a §666 case that supports their position, it is equally true that the government has not cited a §666 case that rejects arguments like those advanced by defendants. And it must be remembered that the issue is the defendant's intent: if the defendant conferred the benefit on the official with the belief that the official would only be doing what he had already determined to do and not to influence the official's behavior, then the benefit would be a gratuity. The bribery/gratuities distinction is not one that straight bribery cases have had to deal with.

not consider the merits of the legislation *for any purpose*, which would include evaluating the *mens rea* of the defendants and in determining whether the trip was a bribe or instead, at most, a gratuity. For similar reasons, that the defendants could argue their good faith defense to the jury, GB:57-58, was of limited, if any, utility, as the court told the jury that they could not consider the merits of the legislation, a central pillar of defendants' good faith defenses.

## III. THE COURT ERRED IN EXCLUDING IMPORTANT DEFENSE TESTIMONY.

The government begins its discussion of this issue by misstating the evidence. Portilla did *not* testify that the passage of 471 would have forced Ranger's armored-car competitors to close down. *See* GB:41. What Portilla said was that the passage of 471 would have required Loomis and Brinks "to send their people, *their general managers that ran the operations here* to become qualified, to receive the training[] and the studies and the qualifying exam established so they could remain in the market and continu[e] rendering or providing services." App:1504. In other words, licensing of the main executive officer in Puerto Rico would satisfy the requirements of 471. Portilla expressly testified that he understood the definition of "main executive officer" in 471 to refer to the head of the corporation in Puerto Rico. App:1636. The government then assumes the conclusion that because the main

executive officers of Loomis' and Brinks' parent companies were headquartered abroad, they would have "presumably" been unable to obtain licenses. GB:41. But this assertion begs the question whether that was in fact what 471 would have required, the very issue on which the district court curtailed the defendants' ability to elicit evidence.

Colberg did not testify that the "chief executive officer" language of 4756 would not have required the head of the foreign parent company to be licensed. GB:43. What he said was that the term referred back to both the Puerto Rico corporation and the United States corporation. App:2358. This was not, as the government would have it, an opinion that it would have sufficed under the cognate language of 4756 for the head of the Puerto Rico corporation to be licensed. Indeed, the district court relied at sentencing on Velazquez's testimony that the language of 471 applied to both the Puerto Rico corporation and the United States corporation as support for its conclusion that 471 would have required the head of the parent company to be licensed. *See* BB:63.

This was the critical point at which the court cut off the permitted questioning of Colberg: when the defense sough to elicit what the "chief executive officer" definition in 4756—the direct predecessor of the "main executive officer" definition in 471—meant in terms of who was required to be licensed. *See* App:2329-30.

24

Colberg was allowed to testify "strictly on the issue of the final language in 4756 as to Chief Executive Officer," App:2335, but the defense was precluded from exploring what that language meant. Similarly, the defense was precluded from asking Velazquez the critical question: whether 471 really meant that the CEO of the foreign parent company would have to be licensed.

The defendants were, to be sure, permitted some leeway in exploring the history and text of 471, GB:45-46, but they were not permitted to elicit testimony regarding the *meaning* of 471's licensing requirement. That excluded testimony was critical to the defense's ability to counter Medina's testimony that 471 would have required the head of the foreign parent company to be licensed, on which the government relied in arguing to the jury that Bravo was a greedy businessman motivated by personal gain.

## IV. THE DISTRICT COURT ERRED IN CALCULATING BRAVO'S GUIDELINES OFFENSE LEVEL.

Contrary to the government's argument, Bravo has shown that the district court's conclusion that the passage of 471 would have forced Loomis and Brinks to immediately go out of business and that their armored car business would automatically go to Ranger in 2005 was clearly erroneous. *See* GB:64-72. The district court may have explained the reasons for its conclusions, GB:68, but Bravo has

thoroughly explained why those conclusions are not supported by the record, nor are they supported by the text of 471 or by the testimony of Portilla, Rivera, or Velazquez. GB:68; *see* BB:64-68. Correctly interpreted, 471 would not have made it more difficult or impossible for the main executive officer of Ranger's competitors to obtain licenses, GB:70—the heads of the Puerto Rico corporation could readily qualify, as Loomis had already done.

Yes, the sentencing court may calculate the benefit figure based on what the defendant expected to receive, GB:69, but the record here does not, for the reasons Bravo has already addressed, BB:69-72, support the conclusion that Bravo would have reasonably expected that the passage of 471 would cause Loomis to immediately cease operations. It is not reasonable to conclude, as the government states, that the "immediate effect would have been that Loomis and brinks would have had to stop providing security services at least until their compliance with the law was determined." GB:69. Loomis and Brinks had been operating for years without proper licensing, and there is no reason to believe that they would not have continued to do so. Perhaps the best refutation of the government's contention is that, when Bravo challenged Loomis' licensing in 2005, a Puerto Rico Court ruled that Loomis was operating illegally but permitted it to continue to operate while Medina completed his qualification for licensing. App:1667-69, 1709. Because the text of 471 is

consistent with a conclusion that the licensing of the main executive officer of the Puerto Rico corporation, Puerto Rico courts would be unlikely to interpret it as evincing a legislative intent to put two large Puerto Rico corporations out of business (if the matter even had to be litigated at all instead of 471's simply being interpreted in common-sense fashion by the administering agencies).

The cases on which the government relies are easily distinguishable from this one. In *United States v. Acevedo-Lopez*, 873 F.3d 330 (1st Cir. 2017), GB:70, the defendant promised the judge that he would help him obtain an appellate judgeship and actively took steps to advance that goal. *See id.* at 334, 336. This evidence, the Court said, provided "substantial circumstantial evidence of the Judge's expectations." *Id.* at 336. A judge could well expect that a promise of assistance by an individual with important political connections would result in an appellate judgeship. The record in this case cannot support a comparable finding, as it provides insufficient basis for a conclusion, even by a preponderance of the evidence, that Bravo reasonably expected that the passage of 471 would force Loomis out of business in 2005 and that its armored car business would all come to Ranger.

Similarly, in *United States v. Suhl*, 885 F.3d 1106 (8th Cir. 2018), the defendant made repeated requests that more and more of Arkansas' juvenile Medicare therapy referrals be sent to one of his companies, and at one point expressly asked

that all the referrals in one geographical region be diverted from a competitor to his companies. *Id.* at 1109-10. The district court's guideline calculation rested on the competitor's revenues for the period when the defendant was actively seeking to obtain them for his companies. *See id.* at 1117. Once again, there is no remotely comparable evidence in this case.

For all the reasons addressed in Bravo's opening brief, the district court's calculation of the benefit to be received was erroneous, and the matter should be remanded for resentencing.

## CONCLUSION

Because the evidence was insufficient to support Bravo's conviction, his conviction should be reversed. If the Court does not reverse the conviction, the conviction should be vacated. At minimum, the matter should be remanded for resentencing.

Respectfully submitted,
By his attorneys,

**/s/ Kimberly Homan**
Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-8616 (Telephone)
(617) 338-9538 (Fax)
homanlaw@aol.com

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

————————————

No. 18-1358

————————————

UNITED STATES OF AMERICA,
Appellee

v.

JUAN BRAVO FERNANDEZ,
Appellant

————————————

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH
LIMITATIONS**

————————————

This brief has been prepared using:

    14 point, proportionally spaced, serif typeface (such as CG Times or Times New Roman). Specify software name and version, typeface name, and point size below:

    <u>WordPerfect Office X8, 14-point Times New Roman</u>

EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; addendum; and the certificate of service, appellant's briefs contain, in total:

    7,170 words, as permitted by Court order of August 15, 2018.

I understand that a material misrepresentation can result in the Court striking the brief or imposing sanctions. If the Court so directs, I will provide a copy of the word or line printout.

                                     **/s/ Kimberly Homan**
                                       Kimberly Homan

## CERTIFICATE OF SERVICE

I, Kimberly Homan, hereby certify that on this 23rd day of August, 2018, this Reply Brief was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal.

**<u>/s/ Kimberly Homan</u>**
Kimberly Homan